**Elizabeth WHEATON, Plaintiff,**

v.

**C. T. HAGAN, D. W. Moorehead, and W. H. Sullivan, Jr., Individually and as Members of the War Memorial Commission, James F. Oshust, Individually and as Manager of the Greensboro Coliseum, and William E. Swing, Individually and as Chief of Police of the City of Greensboro, Defendants.**

**Deborah Kaye WHEELER, Plaintiff,**

v.

**C. T. HAGAN, D. W. Moorehead, and W. H. Sullivan, Jr., Individually and as Members of the War Memorial Commission, James F. Oshust, Individually and as Manager of the Greensboro Coliseum, and William E. Swing, Individually and as Chief of Police of the City of Greensboro, Defendants.**

**Nos. C–74–97–G and C–75–37–G.**

United States District Court, M. D. North Carolina, Greensboro Division.

Aug. 11, 1977.

H. Miles Foy, III, and James A. Medford, Greensboro, N. C., for plaintiffs Elizabeth Wheaton and Deborah Kaye Wheeler.

Jesse L. Warren, City Atty., Dale Shepherd and James J. Coman, Asst. City Attys., Greensboro, N. C., for defendants.

## MEMORANDUM OPINION

GORDON, Chief Judge.

These two cases, consolidated for purposes of discovery and trial, bring into question the constitutionality of search and ar-

rest policies presently in force at the Greensboro Coliseum Complex (hereinafter, the "Coliseum"). In the first case the plaintiff, Elizabeth Wheaton, challenges the official policy that requires Coliseum patrons to submit to search as a condition of entry to the Coliseum. She contends that this policy deprives her and other patrons of rights protected by the First and Fourth Amendments to the Constitution of the United States. She also claims that the search policy is enforced in a discriminatory manner in contravention of the due process and equal protection guarantees of the Fourteenth Amendment.[1] In the second case the plaintiff, Deborah Kaye Wheeler, mounts a similar attack against the search policy but claims, in addition, that an arrest policy in force at the Coliseum has deprived her and others of rights protected by the due process and equal protection clauses of the Fourteenth Amendment. Her contention is that patrons found on the Coliseum grounds in the possession of substances prohibited by the North Carolina Controlled Substances Act, N.C.G.S. § 90–86, et seq., are arrested, while patrons found in the possession of intoxicating beverages in violation of Greensboro City Ordinance § 4–13 and N.C.G.S. § 18A–30 are not arrested. Both plaintiffs ask this Court to declare the search policy unconstitutional and to enjoin the defendants from enforcing it. The plaintiff Wheeler asks this Court to declare the arrest policy unconstitutional and to enjoin the defendants from enforcing it as well.

These actions were tried before this Court, without a jury, in Greensboro, North Carolina, during the August 23, 1976, Session. At the direction of the Court, the parties have filed proposed findings of fact and conclusions of law. These have, in part, been incorporated into the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Both plaintiffs claim to represent classes of aggrieved persons, and this Court has previously ordered that both cases be conditionally maintained, pursuant to Rule 23(c)(1), Federal Rules of Civil Procedure, as class actions under the terms and provisions of Rule 23(b)(2), Federal Rules of Civil Procedure. On the basis of the evidence adduced at the trial, the Court hereby defines the class represented by the named plaintiff in each case as follows:

(a) In *Wheaton v. Hagan, et al,* the named plaintiff Elizabeth Wheaton represents the class of persons who have been required to submit to a search upon entry into the Coliseum as a condition of entry, pursuant to the search policy in force at the Coliseum; and

(b) In *Wheeler v. Hagan, et al,* the named plaintiff Deborah Kaye Wheeler represents the class of persons who have been required to submit to a search as a condition of entry into the Coliseum and have been arrested for the possession of items discovered pursuant to such search. In addition, the named plaintiff, Deborah Kaye Wheeler, represents the class of persons who have been arrested at the Coliseum and charged with the possession of substances prohibited by the North Carolina Controlled Substances Act, N.C. G.S. § 90–86, et seq., the penalty for which is the same or less than the penalty for the possession or consumption of beer, wine or other intoxicating beverages at the Coliseum.

From the evidence adduced at the trial, the Court finds that, in each case, the class represented by the named plaintiff is extremely numerous. In the case of the plaintiff Wheaton it may include, if the defendants' evidence is believed, everyone who has been to the Coliseum since October of 1973; or, if the plaintiffs' evidence is believed, everyone who has been to a rock concert at the Coliseum since October of

---

1. Her contention is that patrons of "rock" concerts are subjected to search while patrons at other events such as basketball games and non-rock concerts are generally not subjected to search. The parties apparently understand the distinction between a rock concert and other concerts; therefore, the Court will not attempt to define the difference other than to note that many, if not all, rock concerts apparently involve "festival seating."

1973. In the case of the plaintiff Wheeler the class is smaller but nonetheless substantial, since plaintiffs' evidence indicates that some 545 people have been arrested for misdemeanor possession of marijuana at the Coliseum, and some 270 others for possession of other controlled substances, many of whom may fall within the class represented by plaintiff Wheeler. In any event the Court finds that the classes represented by the plaintiffs are so numerous that joinder of all the members of each class is impractical; the questions of the constitutionality of the search and arrest policy and the manner of enforcement of these policies are common to all members of the class; the testimony of some ten witnesses on behalf of the plaintiffs who were either members of the class represented by Wheaton or members of the class represented by Wheeler shows that the claims of the representative parties are typical of the claims of the class; this testimony further shows that the representative parties have and will fairly and adequately protect the interest of the class. The testimony of the plaintiffs' witnesses and the defendants' witnesses also shows that in the enforcement of their search policy, Coliseum officials and police have acted in a manner that is generally applicable to each class, thereby making final injunctive relief appropriate with respect to each class as a whole.

2. The parties have entered into stipulations regarding the nature of the Coliseum and the control exercised by the defendants over the policies in force there. The Coliseum consists of a major arena (which can seat between 13,500 and 17,500 people, depending upon the seating configuration), an exhibition hall, a large and a small theater with corollary facilities, and a parking area. The Coliseum is owned by the City of Greensboro; and the defendants Hagan, Moorehead, and Sullivan, as members of the War Memorial Commission, are empowered by ordinance to make rules and regulations for the use and operation of the Coliseum. The defendant Oshust manages the Colise-

um and either carries out the directives of the defendants Hagan, Moorehead, and Sullivan, or is permitted by them to formulate policies for the Coliseum. The defendant Swing is charged by appointment and ordinance with the duty of enforcing the laws of the State of North Carolina and the City of Greensboro and with the duty of supervising and managing the Greensboro police. It is the practice of the Coliseum to engage the services of off-duty policemen to act as security personnel at some events in the main arena. An officer of the Greensboro police is in charge of the off-duty policemen. While at the Coliseum, the off-duty policemen act in their capacity as policemen of the City of Greensboro, wear uniforms, and are armed.

3. The defendants have admitted the existence of the search policy of which the plaintiffs complain, and they have admitted that it was formulated by the defendant Oshust in conjunction with city officials. According to their answer in the Wheaton case and their stipulation at the Final Pre-Trial Conference,

"A policy exists of directing and/or permitting security personnel at the Coliseum and/or policemen of the City of Greensboro, without search warrants, to search members of the public who come to the Coliseum; these searches are conducted at the ticket gate as a condition of entry to the Coliseum; if an individual refuses to be searched, he is denied admission; the defendants have pursued or have permitted the security personnel of the Coliseum and/or policemen of the City of Greensboro to pursue this policy on a regular and continuing basis; and the policy is presently in force. . . "

The principal factual dispute at the trial of these cases centered on the question of how this search policy has been and is, in fact, carried out and on the related question of whether the policy, as enforced, is necessary.[2]

---

**2.** In this connection it should be noted that while some promoters of events at the Colise-

um may approve of the Coliseum search policy, there is no evidence that any of their contracts

4. The search policy was instituted in October of 1973 as a result of a growing concern about crowd behavior.

5. Before the institution of the search policy, and thereafter, there were instances of violence at the Coliseum. Witnesses for both parties described fights at basketball games, wrestling matches, and concerts. The defendant Oshust described a number of instances of unruly behavior at rock concerts. Undercover policemen and uniformed policemen have been assaulted while attempting to arrest people inside the Coliseum at rock concerts. On one occasion the rock performer, Elton John, was hit on the head by a bottle apparently thrown from the audience, but he was able to resume his performance.

6. During the time that the search policy has been in force, a great number of bottles and cans containing alcoholic and non-alcoholic beverages have been confiscated as a result of searches conducted pursuant to the defendants' policy. Four or five guns, assorted knives, other weapons, and one parachute flare have also been confiscated. There have been approximately 494 events at the Coliseum during this time, and there have been 838 arrests. Of these arrests, 545 were for the possession of marijuana and 273 were for possession of controlled substances other than marijuana. Of the total number of arrests, 743 were at rock concerts. Twelve arrests, or 1.4 per cent of the total, were for the possession of concealed weapons. A number of arrests were made as a result of searches conducted pursuant to the search policy of which the plaintiffs complain. From January of 1973 to August of 1976 almost one million people attended events at the Coliseum.

7. The stated purpose of the search policy, as shown by the signs posted at the doors and printed on the back of tickets, is to exclude from the Coliseum grounds, alcohol, drugs, and other contraband.[3] "Other contraband," according to Coliseum officials and police, includes glass bottles, sparklers, and weapons. Items such as knapsacks, packages, parcels, and the like have also been excluded from the Coliseum on occasion, and at certain events tape recorders, cameras, and various concession items such as T-shirts have been prohibited. The Court finds as a fact that the searches of which the plaintiffs complain are conducted with a view towards (1) discovering the presence of alcohol, drugs, weapons, and other items which the Coliseum considers to be contraband, and (2) prohibiting their introduction into the Coliseum.

8. The nature of the defendants' search policy, as implemented, was the subject of considerable testimony at the trial. The defendants Oshust, Captain Lewis, and numerous police officers from the City of Greensboro testified as to the nature of the search procedures. Coliseum patrons who had been searched in various ways and who had witnessed searches also testified about what had happened to them and what they had seen. On the basis of this evidence, plus documentary evidence and a video tape admitted into evidence and viewed by the Court, the Court finds that defendants' policy, as implemented, involves three distinct types of official action.

(a) First, there is the visual surveillance of Coliseum patrons by members of the police and the Coliseum staff. According to Captain Lewis, who was head of security for the Coliseum during the time peri-

---

with the Coliseum call for *search* measures. The evidence is that "security" is customarily requested.

3. The signs read as follows:

"N O T I C E!

"Persons Entering The Coliseum Complex are Subject to Being Searched For Contraband. . .

"ALCOHOL. . .DRUGS and OTHER CONTRABAND ARE EXPRESSLY FORBIDDEN IN AND ON THE COMPLEX PREMISES. . .

"Note. . .
CAMERAS and TAPE RECORDERS are NOT PERMITTED AT ANY NON–ATHLETIC EVENT!"

od in question, the "search policy" at the Coliseum is in force as long as police are stationed at the turnstiles observing the patrons as they come in. This same view was adopted by defendant Oshust.

(b) Second, the defendants' policy involves the observation and confiscation or detention of contraband items in plain view. Captain Lewis, defendant Oshust, and members of the police force testified that when the police observe patrons entering the Coliseum with bottles, knives and cans in plain view, these items may be confiscated or detained and given to the patrons after the concert. Drugs in plain view are confiscated, and offending patrons are arrested. Likewise, patrons who enter the Coliseum carrying large parcels, pocketbooks, knapsacks and the like may be stopped and told that they cannot bring such items inside the Coliseum; alternatively, such patrons may be asked to open the knapsacks, pocketbooks, and the like.

(c) Third, as implemented, the defendants' policy involves the actual physical searches of which the plaintiffs complain. The searches usually occur at or near the turnstile area of the main arena. The usual objects of the searches are women's handbags, men's and women's coat pockets, trouser pockets and other portions of clothing. In the case of handbags, a typical search may occur after a handbag has been opened by its owner at the direction of a police officer. Sometimes the officer himself may remove the contents and search the bag. The search of a coat or a pocket may be conducted by "pat down" or pursuant to a direction that the patron remove items from his pocket or coat. The search of clothing may occur in other ways as well. Some searches, for example, have occurred when men's shirttails were lifted or otherwise examined. Not every handbag is opened. Not every pocket is emptied or patted down. The evidence discloses no clear principle or pattern that would explain why one person is searched and another is not. The defendants do not contend that each search is provoked or justified by circumstances peculiar to each individual case. They do not contend that searches are conducted only where the investigating officers have probable cause to believe that individuals are harboring contraband. It is clear, however, that the defendants believe that the searches are an important part of their overall policy of crowd control and that the basic justification for undertaking to search any given individual in any given case is the fact that the person seeks admission to the Coliseum arena. The search is a condition of entry.

12. As noted above, signs announcing the search policy are posted in or about the Coliseum. Similar notices are printed on the back of tickets for rock concerts. Announcements of the policy are sometimes made over the public address system in the lobby area. The evidence (including live testimony and a video tape of a portion of the crowd at the Rolling Stones Concert of 1974) suggests, however, that many patrons simply do not see or hear these notices. In large part, this fact is attributable to the size of the crowds and physical circumstances of entry into the Coliseum. There is generally a rush on the gates, especially when undesignated festival seating is used.

13. The searches are generally conducted by policemen in full uniform. They have badges and guns. They stand where they can observe individual patrons as they pass, one by one, through the turnstiles. There was some variation in the testimony concerning the exact procedure that is followed when actual searches are conducted at the turnstiles. In general, the police testified that they regularly ask permission before they look into women's purses, although some admitted that on occasion such requests for permission have taken the form of "I need to see into that," or "let me see what you have got there." The plaintiffs presented ten witnesses, including the plaintiff Wheeler, who have actually been searched. While each individual's testimony varied as to what was said, it was clear from the testimony that the language of the officers was such that the witnesses

generally did not perceive that they had the right to refuse to submit to a search. All regarded the officers "requests" as commands, regardless of whether they agreed with them or not.[4]

14. The defendants' evidence, consisting of the testimony of defendant Oshust, Captain Lewis, and members of the police force, was that if any patron refuses to be searched, he is told that he cannot be admitted and that his money will be refunded. Individual officers testified that they have sometimes told patrons they (the patrons) could go back to their cars if they wished but that they would have to be searched before they would be allowed to enter. The plaintiff Wheaton was told, after she refused to be searched, that she could have her money refunded. There is no evidence, however, that the police make it a practice to advise patrons initially that they need not be searched or that they are free to leave. Generally, a patron is so advised only after he has refused an initial request for a search. There are no signs or other indications in or about the Coliseum, on the back of the tickets, or otherwise, stating that a patron may refuse to be searched once he enters the turnstile area. The plaintiffs' witnesses, both those who were searched and arrested and those who were searched and not arrested, were not aware that they could refuse to be searched.

15. There was various testimony on the question of whether the search policy is actually in force at all events, or whether it is in force at rock concerts only. In part, the variation was due to the different definitions that were given to the term "search policy" by the various witnesses. On the basis of all the testimony, this Court finds that policemen are generally present at the turnstiles at all events. They observe patrons coming into the Coliseum, and they observe and detain "contraband" in plain view. In this sense, it can be said that a general policy of crowd surveillance is in force at all events. There was considerable conflict in the testimony, however, regarding the question of whether physical searches of pocketbooks, trousers, and coats are conducted at all events. Police officers testified that they have searched handbags at various non-rock events, such as basketball games and the like. The plaintiffs offered numerous witnesses who had attended basketball games, wrestling matches and other non-rock events, whose testimony was that they did not remember the police ever physically searching any pocketbook or coats or trousers and that they would have remembered such searches if they had occurred. A reserve policeman who had worked the turnstiles at rock concerts testified that an actual policy decision was made not to search handbags at non-rock events. His testimony was contradicted by defendants' witnesses. Whatever the explanation, however, it appears from the foregoing evidence, as well as other evidence offered at the trial, that as a practical matter, there are far fewer physical searches of handbags, pockets, coats, and the like at non-rock events than at rock concerts.

16. While the likelihood that patrons may bring drugs to the Coliseum would appear to be greater at rock events than at non-rock events, it appears, from the evidence offered at trial, that the likelihood that patrons may bring alcohol to the Coliseum is about the same at rock events as it is at basketball games or wrestling matches.

17. The evidence, including the video tapes of the Rolling Stones concert, shows that the greatest crowd control problems occur at events in the Coliseum that use "festival seating" arrangements. Festival seating is, in reality, the use of no seats on

4. The attitude of a typical patron was illustrated by the testimony of Robin Rector, a sixteen year-old high school student from Ruffin, North Carolina. When asked by defendants' counsel whether, at the concert on August 26, 1976, when she was searched, she thought she could have refused, she stated, "Well, I didn't know because when you've got a policeman standing there, you know, you're not going to say, 'well, can I take my pocketbook back?'" Miss Rector was not arrested as a result of her search, for nothing illegal was found; nor was anything confiscated. Other witnesses testified that they were frightened by the officer's request or simply thought that they had to submit.

the ground floor of the Coliseum where there are no permanent seats installed. Instead, patrons sit on the floor or stand, and space is claimed on a first-come-first-seated basis. The results at a sold-out event such as the Rolling Stones concert is an almost uncontrollable rush through the turnstile area in the lobby. Patrons who do not wish to be searched would be understandably reluctant to return handbags or parcels to their cars, inasmuch as they would lose their places in line. Defendant Oshust testified that in his opinion festival seating has helped decrease the crowd-control problem; however, such seating increases the size of the crowd, the intensity of emotion, and the degree of patron participation at rock concerts.

18. There is no evidence in the record to indicate that Coliseum authorities considered or actually tried other means of preventing violence or controlling crowds before the search policy was implemented, although defendant Oshust testified that the light level during performances, the size of the crowd, and the intensity of patron involvement or participation in an event all affect the level of unruliness at functions in the Coliseum.

19. The parties have stipulated to the fact that it is the policy of the police of the City of Greensboro to arrest Coliseum patrons who are discovered, whether as a result of a search or not, in the possession of a substance prohibited by the North Carolina Controlled Substances Act, N.C.G.S. § 90–86 et seq. If a patron is found, whether as the result of the search or otherwise, in the possession of alcoholic beverages, his alcohol is confiscated and he is not arrested or charged unless he is observed to be actually consuming the beverage. This, too, is a matter of policy.

20. It has been stipulated that the possession (in·an open container) or the consumption of beer, liquor, or other intoxicating beverages on the Coliseum property is punishable by imprisonment for not more than six months, or by a fine of $500.00, or both. Possession of less than one ounce of marijuana anywhere in the State of North Carolina was punishable at the time of this trial by imprisonment for not more than six months, or by a fine of $500.00, or both.[5]

### DISCUSSION

These actions arise out of alleged violations of the Constitution of the United States under color of state law. This Court has jurisdiction of these actions under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343 and 2201, et seq. Each action is properly maintained as class actions under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

■ It is clear from the stipulated facts and the evidence that the enforcement of the search policy constitutes state action of such character as may be enjoined by this Court should it be found to violate the provisions of the First and Fourth Amendments to the Constitution of the United States, as those provisions are applicable to the states through the Fourteenth Amendment. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Meredith v. Allen County War Memorial Hospital Commission*, 397 F.2d 33 (6th Cir. 1968); and *Reed v. Philadelphia Housing Authority*, 372 F.Supp. 686 (E.D.Pa.1974).

---

**5.** The plaintiffs and defendants apparently agree that the stipulation with regard to the punishment for the possession of alcohol was in error. Greensboro City Ordinance § 4–13 prohibits the consumption or display of beer, wine, ale, or other alcoholic beverages on the Coliseum property, and the violation of this ordinance is punishable by a fine of not more than $50.00 or imprisonment of not more than 30 days, pursuant to N.C.G.S. § 14–4. Additionally, N.C.G.S. § 18A–30 prohibits the possession and consumption of alcoholic beverages on premises such as the Coliseum through- out the state. Alcoholic beverage possession under this section is a general misdemeanor, the punishment for which is a fine in the discretion of the court, or imprisonment for not more than two years, or both, pursuant to N.C.G.S. § 14–3(a). The punishment for possession of small amounts of marijuana was changed in June, 1977, by the North Carolina General Assembly. Conviction for a first offense of possession of no more than one once of marijuana now carries a penalty of a fine of not more than $100.00. Chapter 862, 1977 Session Laws.

 The parties have stipulated that the searches in question are carried out without search warrants. The Supreme Court has consistently held that the Fourth and Fourteenth Amendments render a search conducted without a warrant unreasonable *per se* "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The burden is upon the defendants to justify the warrantless procedure used at the Coliseum. *United States v. Chadwick,* —— U.S. ——, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). As the Seventh Circuit stated in *United States v. Gamble,* 473 F.2d 1274, 1276 (7th Cir. 1973):

> "There is no principle more firmly rooted in our constitutional jurisprudence than that warrantless search is presumptively illegal. Only where the Government sustains a heavy burden of demonstrating that exigent circumstances rendered impossible the securing of a search warrant or conclusively proves that a knowing and voluntary consent to search was obtained may a warrantless search stand . . . .."

In defining the specific exceptions to the warrant-based-upon-probable-cause requirement, the courts have considered three factors as paramount: public necessity, efficacy of the search, and the degree of intrusion. *Collier v. Miller,* 414 F.Supp. 1357 (S.D.Tex.1976). The exceptions have each been clearly defined and narrowly limited to specific factual circumstances.[6]

 Before considering which if any of these exceptions are similar to the one asserted in the present case, it is necessary to mark out the boundaries of the search policy being challenged by the plaintiffs. The right of police to observe patrons entering the Coliseum is clearly permissible. Further, nothing in the Constitution forbids Coliseum authorities from making reasonable rules and regulations concerning what may be brought into the Coliseum or from enforcing such rules and regulations by normal police procedures. There is nothing constitutionally offensive in the refusal by Coliseum authorities to permit patrons to enter the facility with bottles, knives, guns, drugs, weapons, or any other items that the authorities may reasonably believe to be detrimental or injurious or potentially injurious to the general public. If such items are seen in plain view then they may be confiscated if it is unlawful to possess them, and arrests may be made. What is being challenged by the plaintiffs is not the prohibition of articles such as these, but the admitted policy that requires officers to randomly select patrons and subject them to a search or pat-down. The search of areas of the person or of articles such as handbags to which a patron may have reasonable expectations of privacy in circumstances where there may be no cause for search other than the fact that the person has sought to enter the Coliseum is the practice which the plaintiffs seek to halt.

While most of the exceptions to the warrant-prior-to-search requirements are not applicable to the type of search policy and practice being challenged here, certain aspects of three types of exceptions are sufficiently analogous to require more detailed consideration: (1) searches conducted at airports and courthouses, (2) stop-and-frisk searches, and (3) searches based upon the consent of the person being searched. In *Collier v. Miller, supra,* Judge Carl O. Bue, Jr., analyzes these three categories in detail.

---

**6.** *See United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) [broader searches for contraband and illegal aliens]; *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) [search based upon consent]; *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) [stop based upon articulable suspicions and frisk for weapons]; *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1967) [regulatory inspection of premises of an establishment serving alcoholic beverages]; *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 743 (1967) [exigent circumstances of hot pursuit of an armed criminal suspect]; *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) [search incident to a lawful arrest]; *United States v. Moreno,* 475 F.2d 44 (5th Cir. 1973), *cert. denied* 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973) [airport searches for weapons and explosives]; and *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir. 1972) [search of briefcases and purses upon entering federal courthouse].

His assessments, as summarized here, provide a framework for determining the constitutionality of the search policy and practices employed at the Coliseum.

### Airport and Courthouse Searches

As courts have grappled with the question of warrantless searches at airports and courthouses, careful consideration has been given to the three factors of public necessity, efficacy of the search, and the degree and nature of the intrusion involved. *E. g.,* *United States v. Edwards,* 498 F.2d 496 (2nd Cir. 1974) [airport]; *United States v. Moreno, supra* [airport]; *United States v. Bell,* 457 F.2d 1231 (5th Cir. 1972) [courthouse]; and *Downing v. Kunzig, supra* [courthouse].[7]

The matter of public necessity can be evaluated by examining the nature of the threat to public safety involved and the likelihood that such a threat will materialize. Warrantless searches were instituted at airports and in courthouses because of the unprecedented wave of bombings and other acts of violence which inflicted death or serious injury to a large number of persons in the late 1960's and early 1970's. These terrorist efforts to bomb courthouses threatened to undermine the rule of law, while the attempts to blow up airplanes were often linked to aircraft hijackings. As unruly as patrons at the Coliseum might have been and as great a show of violence as might have occurred with the throwing of a bottle at a performer and the successful attempt to prevent a policeman from making an arrest, the dangers posed by these actions are substantially less than those which justified suspending the warrant requirement in courthouse and airport searches. This does not mean that the disruption of Coliseum events is not a cause for alarm or concern, but rather to suggest that other less constitutionally questionable actions should be employed to control the behavior of those attending activities at the Coliseum.

The defendant Oshust offered his opinion that crowd control problems have lessened since the institution of the search policy. Whether the policy itself is the cause of the decrease is not clear. Fortunately disruptive crowd behavior has subsided throughout the country in recent years, and there is probably no one specific cause for the change. This becomes especially relevant when considering the matter of the efficacy of the search policy and practices at the Coliseum.

Despite the defendants' contention that the search policy has decreased the crowd-control problems at the Coliseum, the evidence, reveals that, unlike in airport and courthouse searches, only a small number of those actually entering the Coliseum are searched. The criteria used by the officers stationed at the turnstiles is subjective and it is obvious that someone wishing to smuggle a weapon or other contraband into the Coliseum could succeed in doing so without using a large pocketbook or parcel or creating a suspicious looking bulge in one's clothing. Further, although the search policy is set forth in writing on the back of tickets and on posters in the Coliseum lobby and is sometimes announced over the public address system, testimony by witnesses for the plaintiffs reveals that patrons attending events at the Coliseum either do not know that the policy exists or do not take it seriously. The mere publication of the policy, coupled with random searches, therefore, does not appear to be an effective deterrent to the introduction of weapons or other contraband into the Coliseum.

 The public necessity for searches under certain circumstances and the efficacy of the procedure chosen must be evaluated carefully along with an assessment of "the degree and nature of intrusion into the privacy of the person and effects of the citizen which the search entails." *United States v. Skipwith,* 482 F.2d 1272, 1275 (5th Cir. 1973). This factor focuses upon the type of search undertaken. The evidence

---

7. *See also* D. Pridgen, *Airport Searches,* 1 SEARCH AND SEIZURE LAW REPORT 9 (1974).

shows that on a random basis pocketbooks and parcels were examined, persons were required to empty their pockets, and individuals were "patted down" by police officers. The examination of pocketbooks and other parcels is similar to the searches made in airports and courthouses. At airports much of the searching is done by metal detectors or by examination of carry-on baggage. *United States v. Moreno, supra; United States v. Cyzewski,* 484 F.2d 509 (5th Cir. 1973); *United States v. Bell,* 464 F.2d 667 (2nd Cir. 1972). Courthouse searches have included the inspection of briefcases and parcels. *Downing v. Kunzig, supra.* Since all persons passing through the area where the search is undertaken are treated equally, no stigma attaches to embarrass the individual subjected to the security measure. Such is not the case in the random searches made of Coliseum patrons. When this unequal treatment is added to the fact the degree of intrusion is great, the defendants face an especially high burden to overcome in order to justify their policy and practices.

The search policy as implemented at the Greensboro Coliseum fails to meet the standards imposed by the courts in airport and courthouse cases. The defendants, therefore, cannot rely on this line of authority to support their warrantless searches.

### The Stop-and-Frisk Exception

Another exception to the warrant requirement is that set forth in *Terry v. Ohio, supra.* While the question raised in *Terry* was the admissibility of evidence in a criminal trial, rather than the constitutionality of the search itself, the Supreme Court noted in *Terry* that "[a] ruling admitting evidence in a criminal trial . . . has the necessary effect of legitimizing the conduct which produced the evidence." 392 U.S. at 13, 88 S.Ct. at 1875.

■ *Terry* set forth a flexible standard of reasonableness to be applied to searches conducted in street encounters between police and citizens, which modified the more rigid test of probable cause.

"Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30, 88 S.Ct. at 1884.

An experienced police officer may use individual discretion in deciding to undertake a search, but he may not base such a decision merely on "inarticulate hunches." 392 U.S, at 22, 88 S.Ct. 1868. The searching officer must be able "to point to specific and articulable facts which, taken together with rational inferences [drawn] from those facts [would] reasonably warrant intrusion." 392 U.S. at 21, 88 S.Ct. at 1880. Under *Terry* an articulable suspicion that a person was "armed and presently dangerous" was held sufficient to justify a stop-and-frisk search, even if such a search includes a "severe . . . annoying, frightening, and perhaps humiliating [intrusion]." 392 U.S. at 24–25, 88 S.Ct. at 1882.

■ The searches at the Coliseum do not rise to the *Terry* standard. Anyone with a large pocketbook or parcel is a candidate for a search, and there is nothing in the record to explain why some are searched and others who are also carrying these items are not. Further, unlike the searches in the stop-and-frisk situation or in the airport and courthouse settings, the policy in force at the Coliseum is not limited to searches for inherently lethal weapons. The policy also seeks to uncover other items of contraband including controlled substances, tape recorders, cameras, and alcoholic beverages. Clearly, *Terry v. Ohio* does not sanction wholesale searches of the general public in the absence of exigent circumstances, even though the officials doing the searching have a valid interest in preventing potential injuries. *See United States v. Davis,* 482 F.2d 893, 906 (9th Cir. 1973).

The fact that *Terry* does not support the general patterns of searches at the Coliseum, however, does not mean that there are no circumstances under which warrantless searches may be lawfully conducted. There may be instances when an investigative stop-and-frisk search would be justified in order to protect the officers and surrounding patrons present in the Coliseum. When the *Terry* standards are met, such searches are permissible.

*Searches Based upon Consent*

 The defendants have relied upon the consent of the patrons, either expressed or implied, as a justification for their policy. In *Schneckloth v. Bustamonte, supra,* the Supreme Court held that where there is a claim of consent to a warrantless search, the validity of the alleged consent will depend upon the voluntariness with which it is given. The question of voluntariness depends upon the "totality of all [of] the surrounding circumstances." 412 U.S. at 226, 93 S.Ct. [2041] at 2047, 36 L.Ed.2d 854. The courts have identified a number of factors that should be considered in determining whether or not a given search was conducted with the consent of the individual being searched. These include the apparent authority of the searching officer, *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); the presence of a substantial number of law enforcement officers, *United States v. Hearn,* 496 F.2d 236 (6th Cir. 1974); the nature of police questions, the subjective state of the individual, and the environment in which the search was conducted, *Schneckloth v. Bustamonte, supra*; whether the subject was advised of the constitutional right to refuse, *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); and whether refusal would result in deprivation of a right or benefit, *United States v. Albarado,* 495 F.2d 799 (2nd Cir. 1974).

 Considering these factors and applying them to the evidence now before the Court, it is clear that the "surrounding circumstances" at the Coliseum do not militate in favor of truly voluntary searches. Although patrons are attending entertainment events, they are confronted upon entering the Coliseum with a substantial number of police. The officers are dressed in police uniforms and are armed. By virtue of the warning on the signs and back of the tickets and the statements of the police themselves, the officers exercise apparent authority to conduct the searches. If patrons refuse to be searched, then they must give up their right to enter the Coliseum. *Schneckloth* held that a search is not defective merely because the person being searched was not advised of his right not to be searched. The evidence in this case reveals that many of the patrons at the Coliseum do not in fact know of their right to refuse, and this lack of knowledge further supports the conclusion that their expression of consent, when forthcoming, cannot be "voluntary" to the degree required by the cases. This is especially true in those instances when the officer making the search implies to a patron that the matter of voluntariness is not even at issue by making a statement such as "I need to see in your purse." Therefore, considering the "totality of the surrounding circumstances" it is concluded that the present search policy as implemented at the Coliseum does not afford patrons the opportunity to voluntarily consent to be searched.

 In light of the determination that general warrantless searches of patrons entering the Coliseum are prohibited by the Fourth Amendment and fail to qualify under any of the specific limited exceptions which have been made to the requirements of the amendment, it is unnecessary to reach the question of whether the defendants' search policy constitutes an impermissible prior restraint on the freedom of assembly. Likewise, it is unnecessary to reach the question of whether the searches are conducted more often at rock concerts than at other events and, if so, whether that by itself would render the policy constitutionally infirm under the equal protection clause of the Fourteenth Amendment.

## Alternatives

Although the present search policy fails to meet necessary constitutional standards, it is apparent from the evidence that Coliseum officials face a real and sizeable crowd-control problem, especially at events where festival seating is employed. Patrons and performers alike have a right to a reasonable expectation that they can enjoy entertainment at the Coliseum without endangering themselves because of another's misconduct or thoughtless behavior.

Any search policy that centers around examining patrons as they enter through the Coliseum turnstiles is bound to be chaotic and uneven as long as unreserved seating arrangements are used. Pushing and shoving to gain entry will remain difficult, if not impossible, to control. Clearly, the problem would be eased if patrons all had assigned seats. This procedure would also enable Coliseum officials and police to maintain better surveillance of those attending, since aisles could be kept clear and an atmosphere of order encouraged. In fact, the ending of festival seating might prove sufficient by itself to alleviate the necessity of any search policy at the entrances to the Coliseum.

In addition, crowd-control problems are accentuated by the atmosphere created at scheduled events in the Coliseum. While rock groups that seek to enhance their reputation by building up their audiences into almost hysterical frenzies may be reluctant to lower the decibels of their amplifiers or raise the level of lighting during their performances, some adjustments along these lines might also significantly ease crowd-control problems, without raising constitutional questions.

If authorities determine that some form of search policy is required as a last resort to control crowd behavior, such a policy should contain more safeguards for those who will be subject to it. Without seeking to define exactly what type of policy will pass constitutional muster, in part because that cannot be determined until the method by which the policy is actually put into practice is known, there are several alternatives readily apparent. All parcels, bundles, and pocketbooks over a certain size could be banned from the Coliseum grounds, with appropriate notices to that effect placed on tickets and signs. Some form of check rooms such as those used by museums and other large public buildings could be provided for parcels and other such objects, with a fee charged that would cover the cost of operation of such facilities. If random searches are still deemed necessary after other efforts have failed, they would be less objectionable if genuinely voluntary consent could be established. This might be achieved by having officers at the turnstiles dressed in civilian clothes and by notifying patrons that they must either take their parcels, pocketbooks, or whatever is causing the bulges in their pockets out to their cars or else be subject to a search. Obviously a degree of indirect coercion will still remain, however, if festival seating is in force since patrons will be reluctant to jeopardize their place in line to go back out to their vehicles.

## Enforcement

There remains the plaintiffs' challenge to the Coliseum's official policy of arresting possessors of small amounts of marijuana and not arresting possessors of alcoholic beverages. Asserting that this policy violates the due process and equal protection clauses of the Fourteenth Amendment, the plaintiffs seek to have enforcement of the drug laws enjoined.

It is true that it is the role of legislative bodies to enact legislation and the role of law enforcement officials and the courts to carry out the dictates of the legislatures until and unless the statutes and ordinances being enforced are repealed or declared unconstitutional. It is, therefore, disturbing to note that some of North Carolina's laws governing the possession of alcoholic beverages in public places are not enforced at the Coliseum. This does not mean, however, that the distinction made by law enforcement officials at the Coliseum rises to the level of discriminatory or selective enforcement of the law that is prohibited by the due process or equal pro-

tection clauses. Further, the evidence at trial tends to show that while persons entering the Coliseum were not arrested for possession of alcoholic beverages, patrons who were seen consuming them were arrested and prosecuted.

Clearly several separate offenses covered by separate sections of the state statutes and by local ordinances are involved. Possession of marijuana is an offense at all times and in all places under the North Carolina Controlled Substances Act. Possession of alcohol is not a crime *per se* in this state; it rises to that level only in certain designated locations, including public places such as the Coliseum complex. The penalties set forth for persons found to have violated the various statutes and ordinances are different. It is apparent that, to the extent that these laws represent the views of the citizenry, the public feels differently about the possession of controlled substances than it does about the possession of alcoholic beverages.

The plaintiffs have two hurdles to overcome in order to successfully assert discrimination based upon selective prosecution. First, they must prove that they have been treated differently than persons similarly situated. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Persons violating distinct, separate statutes are not so similarly situated, and there is evidence that all persons suspected of violating a specific statute are all treated similarly.

Assuming, *arguendo,* that a single class of violators might be defined that includes persons who are found to possess either marijuana or some form of alcoholic beverage, the plaintiffs still will not be able to prevail unless they can show that selective enforcement is based upon some constitutionally impermissible ground such as race, religion, or the exercise of the First Amendment right to free speech. *Oyler v. Boyles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *United States v. Peskin, 527 F.2d 71 (7th Cir. 1975); United States v. Oaks,* 527 F.2d 937 (9th Cir. 1975); *United States v. Berrios,* 501 F.2d 1207 (2nd Cir. 1974).

There is no evidence in the record to support a finding that any selective enforcement occurred which was based upon any impermissible considerations.

## CONCLUSIONS OF LAW

1. The policy instituted and enforced by the defendants of conducting random searches for contraband of pocketbooks and other large parcels in the possession of persons entering the Greensboro Coliseum Complex and of conducting random pat-downs of persons with bulges in their clothing who are entering the Greensboro Coliseum Complex is in violation of the Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment to the United States Constitution, and shall be enjoined.

2. The practice of the defendants to arrest or cause to be arrested persons present at the Greensboro Coliseum Complex who have marijuana in their possession and not to arrest or cause to be arrested persons found at the Greensboro Coliseum Complex who have alcoholic beverages in their possession is not unconstitutional and does not violate either the due process or equal protection clauses of the Fourteenth Amendment to the United States Constitution.