Steven STROEBER, Julie Golden, Lisa Parmley, Iowa Norml, and the Iowa Civil Liberties Union Foundation, Plaintiffs,

v.

COMMISSION VETERAN'S AUDITORIUM, Ray C. Stiles, Individually and as Commissioner, Russell H. Laird, Individually and as Commissioner, Peter Watrous, Individually and as Commissioner, Harry J. Bradley, Jr., Individually and as Commissioner, Everett S. Newcomb, Individually and as Commissioner, David Palmitier, Individually and as the Manager of Veteran's Auditorium, Wendell Nichols, Individually and as Chief of Police of the Des Moines Police Department, Defendants.

Civ. No. 77-274-2.

United States District Court, S. D. Iowa, C. D.

Oct. 14, 1977.

Mark W. Bennett, Staff Counsel, Iowa Civil Liberties Union, Judd Golden, NORML State Coordinator, Des Moines, Iowa, for plaintiffs.

James P. Irish, Irish & Skinner, Altoona, Iowa, for all defendants except Wendell Nichols.

Eugene E. Olson, Des Moines City Legal Dept., Des Moines, Iowa, for defendant Wendell Nichols.

## MEMORANDUM AND ORDER

HANSON, District Judge.

This action brings into question the constitutionality of search procedures conducted during "rock concerts" held at Veterans Memorial Auditorium in Des Moines, Iowa. Plaintiffs, rock concert patrons who seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343 and 2201, claim that said search procedures are in violation of their First, Fourth, and Fourteenth Amendment rights. On October 4, 1977, subsequent to the Court's denial of plaintiffs' September 20, 1977 application for a temporary restraining order, this matter of declaratory and injunctive relief was fully heard and tried on the merits of plaintiffs' amended and substituted complaint. Fed.R.Civ.P. 65(a)(2). Having now heard the evidence and considered the parties' arguments, the Court enters the following Findings of Fact and Conclusions of Law in support of its judgment that the contested search procedures cannot withstand Fourth Amendment scrutiny.

## I. FINDINGS OF FACT

### A. Parties

Individual party plaintiffs to the instant action are Steven Stroeber, Julie Golden, and Lisa Parmley, all of whom have previously attended rock concerts at the Auditorium and who, in particular, were ticket holders to the "Zappa" concert on September 20, 1977. Two organizations, Iowa NORML and the Iowa Civil Liberties Union, are also named plaintiffs in this lawsuit. Iowa NORML is an affiliate of NORML, which is a national non-profit corporation advocating that the use of marijuana be decriminalized. The Iowa Civil Liberties Union is an association organized and founded for the stated purpose of promoting and defending rights guaranteed to all citizens under the Constitution of the United States. Plaintiffs Steven Stroeber and Julie Golden are members of Iowa NORML; plaintiff Lisa Parmley is a member of the Iowa Civil Liberties Union.

Defendants Ray C. Stiles, Russell H. Laird, Peter Watrous, Harry J. Bradley, Jr., and Everett S. Newcomb are presently serving as members of the Veterans Memorial Auditorium Commission, and each is herein being sued individually and in his capacity as a commissioner pursuant to Chapter 37, Code of Iowa (1977). Also named as defendants, in addition to the

Commission itself, are David Palmitier, manager of the Auditorium, and Wendell Nichols, chief of police for the City of Des Moines Police Department. Both men are said to have been instrumental in setting up the search procedures at the Auditorium.

Plaintiffs seek to maintain this lawsuit as a class action on behalf of all those persons who have and will attend Auditorium rock concerts and who have been and will be subject to search upon the entry into the Auditorium. In accordance with Rule 23(b)(2) of the Federal Rules of Civil Procedure, it is alleged that defendants' illegal actions as to each member of this class can be appropriately and fully remedied by the issuance of declaratory and injunctive relief directed to the class as a whole.

### B. Search Procedures at the Auditorium

The testimony of Commissioners Stiles and Watrous and Assistant Manager Merton A. Barr indicated that the Auditorium Commission, because of certain purported incidents involving property damage, personal injury, alcohol, drugs, and general rowdiness at rock concerts, adopted and instituted more stringent security measures at the Auditorium in early 1974. These measures, which the Court finds for the most part to have been in effect for rock concerts but not other events at the Auditorium, included the posting of a notice warning patrons not to enter the arena with contraband ("controlled substances" or "alcoholic beverages"), the playing of an amplified tape recording warning patrons of the same, and the checking of patrons and their personal effects by security guards for contraband and items that might be used as weapons or projectiles.

Though ultimately reimbursed by concert promoters, the Auditorium Commission does employ and pay off-duty policemen to serve as security guards. Lieutenant Derald R. Leaming, who has been chief of security for the past eighteen months at the Auditorium, is contacted by the Auditorium management prior to what it determines to be a "rock concert." Either Leaming, or Sergeant Charles Sanders, both of the Des Moines Police Department, in turn solicit fellow policemen to work off-duty hours at the rock concerts. Twenty-three such policemen generally appear at the Auditorium in full uniform, with badge and sidearms, while two others, one of them often a matron, are attired in civilian clothes. Prior to the concert, sixteen to eighteen policemen are stationed inside the Auditorium, and the remaining officers are assigned to traffic control. Those policemen checking patrons for contraband and other prohibited items stand in the Auditorium's inside foyer near the turnstiles.

Police Chief Wendell Nichols is involved in this off-duty service by the police only to the extent that he must give written authorization in order for the men to wear their uniforms. Otherwise, the enforcement of security is under the control of Leaming or Sanders, who look to the management, which is responsible to the Commission, for approval and suggestions. When the police make an arrest, they do so in their capacity as officers, but it is the Commission that brings charges against arrested patrons.

Patrons, before entering the Auditorium, are not in any way forewarned that security officers, or Auditorium personnel, will check for and either confiscate or detain contraband and other items. At the direction of the Auditorium Commission, a single sign intended to convey this warning is posted near the doors between the lobby, where the tickets are sold, and the inside foyer, where the tickets are taken.[1] The Commission has also authorized and authored a tape recording which plays over the loudspeakers in the lobby area. This tape, which has a recorded message less than a minute in length, further warns patrons that they may be checked for contraband.[2] Although the tape recording is to

1. The sign states:

   "It is illegal to bring a controlled substance or any alcoholic beverages onto these premises. All persons must be seated in the chairs provided. Violators will be prosecuted."

2. According to the testimony of Mr. Barr, the tape states:

be played continuously from the time the ticket windows open until the concert begins, plaintiffs testified that they did not hear it on the night of the "Zappa" concert.

In checking for contraband, or other items that might serve as weapons or projectiles, the police attempt to observe all patrons who enter the arena. Detection of contraband and the other prohibited items is made by either visual surveillance or actual search. Bags, parcels, and purses are sometimes opened and checked upon request, and male patrons, who wear bulky clothing or have pockets where items might be concealed, may be subjected to a pat-down search as a condition to entry. Prohibited items, such as pop cans, and knives, are taken, marked, and can be reclaimed at the end of the concert. Contraband drugs are confiscated, and the possessing patrons often arrested. In response to questions at the hearing, the security officers conceded that not all patrons are checked. Indeed, the initial onslaught of people when the doors first open was said to make visual surveillance or physical search of all patrons impossible.

There is conflicting evidence as to what the police tell patrons prior to any search of their person or personal effects. Some testimony indicated that police ask to search patrons without first informing them of their right to refuse and have their tickets refunded; other testimony suggested that the police request to search patrons only after informing them of their right to refuse and have their tickets refunded. The conflicting testimony is explained in part by the changing search procedures and the lack of specific guidelines. It is apparent to the Court that prior to the "Zappa" concert, which gave rise to this action, patrons were not told until search was refused that the tickets, which contained nonrefundable language, could in fact be refunded. At no time has there been a specific search policy. Each policeman, as the Auditorium Commission evidently intended, ultimately relies upon his own knowledge of the law to determine whether a particular patron should be searched. Searches, when conducted, have apparently been based most often upon either the clothing patrons were wearing or the bags, parcels, or purses that they were carrying.

A few patrons have refused to be searched and have had their tickets refunded. A far greater number have submitted to the search. Some, after permitting a search, have been arrested for violations of state law.

While uncertain and unable to offer evidence as to the effectiveness of the search procedures at the Auditorium, the commissioners, management, and police believe the procedures are a necessary deterrent to disruptive and illegal behavior at rock concerts. No one, however, has contended that the searches stop all contraband or prohibited items from entering the Auditorium. Nor have the defendants refuted plaintiffs' assertion that the searches have been conducted in an essentially random fashion.

## II. CONCLUSIONS OF LAW

### A. Parties

■ Plaintiffs predicate their action for declaratory and injunctive relief upon 42 U.S.C. § 1983:

Every person who, under color of any statute . . . of any State or Territory, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

Alleging that the named individual defendant commissioners and manager have adopted or acquiesced in a policy violative of their Fourth Amendment rights, the *individual* plaintiffs clearly possess the requisite standing to bring this cause of action.

"No alcoholic beverages, pop or controlled drug substances are permitted to be in the auditorium. No smoking is allowed in the seating area. Smoking is permitted only in the hallways or restrooms. For the safety of those admitted to the seating area, you may be checked to see that these auditorium rules are complied with."

Their alleged injury is not hypothetical in nature, and defendants, in testimony before this Court, have openly manifested an intent to continue the search procedures presently in force for rock concerts at the Auditorium. *See Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

■ Yet, with respect to the plaintiff organizations, Iowa NORML and the Iowa Civil Liberties Union, there may exist some question as to whether they have stated sufficient justiciable injury to permit them to bring this action. *Warth v. Selden,* 422 U.S. 490, 498–501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The parties having neither raised nor argued this particular standing issue, the Court finds it need not be addressed in order to either determine or effect the necessary relief. This is especially so since the Court now holds that the named individual plaintiffs do satisfy the prerequisites for bringing this action on behalf of that class of persons who have and will attend Auditorium rock concerts and who have been and will be subject to defendants' search procedures. *See* Fed.R. Civ.P. 23(a).

■ To bring their action under Section 1983, plaintiffs, in addition to demonstrating the requisite injury, must establish that defendants' actions were marked by "state action." Here, where the commissioners purported to act in a capacity made possible by virtue of state statutes and were acting to provide security for a public facility financed by public monies, the requisite "state action" is present. Chapter 37, Code of Iowa (1977); *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Meredith v. Allen County War Memorial Hospital Commission,* 397 F.2d 33 (6th Cir. 1968); *Wheaton v. Hagan,* 435 F.Supp. 1134 (M.D.N.C.1977).

■ While the commissioners and manager are individually subject to liability pursuant to Section 1983, the Commission itself, which is named as a party defendant, may be immune from suit. *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Alexander v. Kammer,* 363 F.Supp. 324 (E.D.Mich.1973). Again, for purposes of resolving the present litigation, the Court need not determine this issue, another issue that neither party has chosen to argue. The Court, though, must consider the motion of defendant Nichols, which requests judgment favorable to him on grounds that he is not amenable to suit under Section 1983.

■ The only evidence of defendant Nichols' involvement in this action is that he, as chief of police, authorized the use of uniforms by off-duty policemen at the Auditorium. Such is insufficient involvement in the alleged unlawful searches to permit liability under Section 1983. *Rizzo, supra; Bezdek v. City of Elmhurst,* 70 F.R.D. 636 (N.D.Ill.1976). Furthermore, Chief Nichols, with regard to whom plaintiffs have shown neither knowledge nor accountability, cannot be held liable under a theory of *respondeat superior. Delores Taken Alive v. Litzau,* 551 F.2d 196 (8th Cir. 1977). The Court, therefore, will order that summary judgment be entered for defendant Nichols.

*B. Warrantless Searches*

■ The Warrant Clause of the Fourth Amendment is intended to ensure reasonableness of search by requiring a preliminary attestation and finding of probable cause. From this critical warrant procedure, the United States Supreme Court has carved but "a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Each of these exceptions developed only after the Supreme Court had decided over a period of years that public necessity required a narrowing of a person's "expectation of privacy" under the particular circumstances in question. These exceptions have remained very limited in scope, and the Supreme Court has been openly reluctant to expand upon them. *See United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

■ The Fourth Amendment prohibition against unreasonable searches is applicable to state action through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Hence, this Court, in considering the warrantless searches at issue in this case, must specifically determine whether such searches fit within one of those few exceptions that the Supreme Court has found to the "warrant based on probable cause" requirement of the Fourth Amendment.

In making this determination, the Court does not consider each of the recognized exceptions to the Warrant Clause. Two other federal district courts have only recently reviewed these exceptions in the context of searches at public auditoriums, and this Court, which finds no fault in those courts' conclusion that the exceptions are inapplicable, sees no reason to retrace that analysis in full. *See Collier v. Miller*, 414 F.Supp. 1357 (S.D.Tex.1976); *Wheaton, supra*. The Court, however, will examine the facts underlying the Auditorium search procedures in light of the "stop-and-frisk" and "consent" warrant requirement exceptions, the two exceptions which defendants apparently claim apply to the situation in question. Prior to reviewing this claim, the Court would reiterate that the burden of proof is upon the defendants to show that either one of these exceptions excuses their warrantless searches. *Chadwick, supra*.

The United States Supreme Court first set forth the stop-and-frisk exception to warrant searches in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry, Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), and later in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court held that a police officer may "conduct a carefully limited search" of a person when he has specific, articulable facts which "[lead] him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry, supra*, 392 U.S. at 30, 88 S.Ct. at 1884. The Supreme Court, in these decisions, made clear that the purpose be-

hind the approved pat-down search was for protection of the officer and others from concealed weapons and not for the discovery of incriminating evidence. To justify a stop-and-frisk search, therefore, the government must focus on the search of the particular individual and demonstrate that there was specific cause for the officer to fear bodily harm. *See Sibron, supra; Adams, supra*.

■ The stop-and-frisk exception is wholly inapposite to the present situation. In the random search of patrons and their personal effects, the police did not proceed on the requisite individualized basis, much less on specific and articulable facts giving rise to reasonable suspicion that criminal activity was afoot and danger imminently present. Moreover, these officers, on no more than inarticulate hunches, conducted pat-down searches which were admittedly directed in part to uncovering controlled substances rather than concealed weapons. There simply is no question that these random and arbitrary preventive search procedures cannot be justified on the basis of the stop-and-frisk doctrine.

■ In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the United States Supreme Court did find, as defendants suggest, that one may consent to a police officer's search of his person or personal effects. The *Schneckloth* holding, though, was not without limitations.

> We hold . . . that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances . . . .

*Schneckloth*, at 248–49, 93 S.Ct. at 2059. Voluntary consent to search, even in the absence of "the subject's knowledge of the right to refuse," is certainly possible.

*Schneckloth, supra.* But, such consent is not to be readily inferred, for courts must indulge every reasonable presumption against the waiver of fundamental constitutional rights. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

Applying the law to the facts of the present case, this Court cannot conclude that plaintiffs voluntarily submitted to a search of their person and personal effects. Individual patrons are not forewarned of the possible search until entering the Auditorium, and even then the warnings, a sign and a tape recording in a crowded and noisy lobby, are inadequate. The sign says nothing of a search, the tape indicates a "check" but nothing of confiscation of contraband, and neither informs patrons of their right to refuse search and have their tickets refunded. Having purchased tickets, and in some instances having already presented them to an usher at the turnstiles, a random number of patrons are suddenly confronted by armed uniform police officers and told that their admission to the concert is conditioned upon their submission to a physical search of their person and personal effects. Whether told of their right to have their tickets refunded before or after being asked to submit to a search is of little consequence. Under the circumstances, which are marked by coercion and duress, the Court cannot possibly conclude that any ensuing consent to search was of a voluntary nature. Nor have the defendants, despite bearing the burden of proof, introduced substantive evidence to suggest that consent was unequivocally and freely given. The mere fact that most patrons submitted to search bespeaks more of coercion and duress than voluntariness.

*C. Conclusion*

If this wholesale search of patrons by off-duty policemen at the Auditorium was held to be permissible, the Court would be carving from the Fourth Amendment Warrant Clause an exception without precedent. This the Court is unwilling to do. Such exceptions are not to be lightly drawn, and certainly one could not otherwise be made on the basis of the record before the Court. In large part invoking "public necessity" as a conclusionary justification for the search procedures, defendants have failed their burden of demonstrating that traditional police procedures, which have been found reasonable and sufficient to cope with dangers in other contexts, are inadequate for deterring the crown control problems that arise during rock concerts at the Auditorium.

The Court hastens to add that there is nothing constitutionally offensive in the Auditorium Commission's adoption of rules and regulations banning drugs, alcohol, glass bottles, pop cans, knives and the like from the Auditorium. Nor is there anything impermissible in employing off-duty policemen to enforce these rules and regulations, and the laws of the State, by appropriate and approved search procedures. Rather, it is the unjustified random, coercive, and intrusive nature of defendants' present search procedures which the Court finds to be in conflict with plaintiffs' Fourth Amendment rights.

Having determined that plaintiffs are entitled to the requested relief pursuant to their Fourth Amendment argument, the Court need not consider their First Amendment or Fourteenth Amendment equal protection claims. However, the Court, while not adjudicating these further claims against the present search procedures at the Auditorium, would observe that the apparent disparate treatment both as between patrons to rock concerts and patrons to other events, and as between patrons at rock concerts alone, might prove difficult to justify.

### III. ORDER FOR JUDGMENT

For the reasons heretofore stated, and through the authority vested in this Court by 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343 and 2201,

IT IS HEREBY ADJUDGED AND DECREED that the search policy and procedures in effect for "rock concerts" at Veterans Memorial Auditorium are in violation of

the Fourth Amendment to the United States Constitution and that said policy and procedures have caused plaintiffs irreparable harm.

IT IS THEREFORE ORDERED that the defendant commissioners and manager of Veterans Memorial Auditorium are henceforth permanently enjoined from subjecting plaintiffs, and the members of the class they represent, to unconstitutional searches of their person, purses, parcels, clothing, and other personal effects as a condition for entry to rock concerts at Veterans Memorial Auditorium.

IT IS FURTHER ORDERED that summary judgment be entered in favor of defendant Wendell Nichols.

IT IS FURTHER ORDERED that a possible award of attorney fees under 42 U.S.C. § 1988 shall not be made until such time as records and affidavits in support thereof are filed with the Clerk of Court.