**Tony JEFFERS, Plaintiff,**

v.

**Debbie HEAVRIN, City of Louisville, Kentucky, Jefferson County, Kentucky, and Churchill Downs, Inc., Defendants.**

**Civ. A. No. C–84–0211–L(M).**

United States District Court,
W.D. Kentucky,
at Louisville.

Oct. 18, 1988.

---

**61.** *See* opinion, *supra* at pp. 1313 ff.

Christopher P. Rivers, Albert Quick, U. of L. School of Law, Belknap Campus, and David A. Friedman, ACLU of Kentucky, Louisville, Ky., for plaintiff.

M. Stephen Pitt and William H. Hollander, Wyatt, Tarrant & Combs, James C. Hickey, Ewen, Mackenzie & Peden, William Warner, Miller, Conliffe, Sandman, Gorman & Sullivan, Louisville, Ky., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEREDITH, District Judge.

This matter is before the Court for judgment. The case was tried before the Court in June of 1986 and the parties were granted additional time in which to prepare and submit post-trial briefs. The Court being otherwise sufficiently advised, now enters its Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

Churchill Downs is a thoroughbred horseracing facility owned and operated by Churchill Downs, Inc., a private corporation. Each year on the 1st Saturday in May, Churchill Downs holds the world-famous Kentucky Derby. In 1967 or 1968, Churchill Downs instituted a policy of inspecting patrons for alcohol on all days the track was open. Private or "merchant" police were employed to conduct the searches, which consisted chiefly of a visual inspection of an individual's parcels while the individual moved the contents around. A Churchill Downs official testified that because people frequently brought food it was felt that the private police should not use their hands. This policy was founded primarily on the premise that drunkenness would be minimized by preventing patrons from bringing their own alcohol to the track. Churchill Downs continued and still continues to sell both beer and liquor inside the grounds at what some would consider inflated prices.

Also beginning in the late sixties, at the request of Churchill Downs, the Jefferson County Police Department ("JCPD") patrolled the infield area of the Downs on Derby Day. The infield is the area inside the one mile oval racetrack. There is no seating in the infield, and it is open to spectators only on the day of the Kentucky Derby. In recent years, attendance in the infield has been approximately 75,000 people.

This decision for the JCPD to patrol the infield was unrelated to the decision to search for alcohol, but arose out of concerns that the Derby might be disrupted due to disturbances and protests in earlier years over the passage of "open housing" legislation. Each year thereafter, Churchill Downs requested the JCPD to provide infield patrols at the Derby, and the JCPD did so. The City of Louisville Police patrols the Grandstand and Clubhouse areas as well as parking lots. Other law enforcement agencies, including the Kentucky State Police, the FBI, the National Guard, and the Secret Service, have also provided security in past years.

In February 1981, the JCPD informed Churchill Downs by letter of its intention to extend its patrols to include conducting the inspections at the gates to the infield. The JCPD was concerned about the number of injuries to members of the public and to police officers occurring in the infield, and believed that the private police were not adequately inspecting patrons' parcels. Numerous fights, injuries from thrown and broken glass, and instances of abuse of women were cited at trial as other particularized reasons which prompted the letter. The JCPD believed that certain items should be excluded, and that its officers were better trained to screen patrons' parcels at the gate.

The letter listed items which the JCPD wanted to search for, and requested that Churchill Downs post signs at the entrances informing patrons of the fact that such items were prohibited and that their parcels would be searched for them. These prohibited items included "grills, charcoal, bottles, cans, weapons, and any item which may be used as a weapon or missile."

In response to the letter and to complaints from the manager of the track's nursing service about the number of injuries, Churchill Downs agreed to allow the JCPD officers to conduct the searches at the infield gates. Both Churchill Downs and the JCPD agreed that the final decision of whether to allow the JCPD officers to conduct the searches was made by Churchill Downs. Large signs were posted which read: "NOTICE GRILLS, CHARCOAL, BOTTLES, WEAPONS AND ANY ITEM

WHICH MAY BE USED AS A WEAPON OR A MISSILE, WHICH COULD BE USED TO INJURE THE GENERAL PUBLIC ARE EXPRESSLY FORBIDDEN IN AND ON CHURCHILL DOWNS PROPERTY. PATRONS MUST TAKE THEIR PARCELS BACK TO THEIR VEHICLES, DEPOSIT SUCH ITEMS IN A DUMPSTER OR SUBJECT ITEMS TO INSPECTION BY POLICE." These signs were identical to that suggested by police, except for the exclusion of cans as forbidden items. Cans were not included because phone receptionists at the track had told callers that soft drink cans would be permitted. Churchill Downs agreed that all other items suggested by the police should be prohibited. The signs were positioned at the entrances so that they could be seen by those waiting in line to pay admission. In addition, Churchill Downs continually played over loudspeakers a taped announcement which read the sign, stated that alcoholic beverages were also prohibited, and gave ticket information.

Each year since 1981 the search procedure has been substantially the same. JCPD officers conduct the searches at the infield gate and are relieved in the afternoon by the private police, who also conduct the searches at other gates during the entire day. Every patron who enters the track with a parcel must submit the parcel to a search, while those who do not have parcels may enter through separate turnstiles. Generally, two officers are placed behind each turnstile to search parcels after patrons have paid admission. Additionally, officers are instructed to "pat-down" individuals wearing unusually bulky or unseasonably warm clothing. Each search requires only a brief stop of the person. Confiscated items which individuals do not return to their cars are thrown into a dumpster. In an attempt to avoid confiscation, patrons often go to unusual or extreme measures to "smuggle in" forbidden items, especially alcohol.

Since 1981, the number of injuries on Derby Day requiring treatment has significantly decreased. The total number of people treated at first aid stations has dropped from approximately 400–450 to 300. The number of cuts requiring sutures has dropped by at least fifty per cent, and from a high of 50 or more to 10 or fewer. Whereas prior to 1981 most of the cuts were caused by broken glass (16–20), now only 4 or 5 cuts per year needing sutures are caused by glass. Injuries from fights have dropped by about half as well.

On May 7, 1983, Tony Jeffers, of Fort Wayne, Indiana, left Muncie, Indiana, with three friends early in the morning for the four-hour trip to Louisville to attend the Derby. Among the various items they brought with them were blankets, a cooler, and a grocery bag. The bag contained food items such as bags of cookies and potato chips as well as a used Pringles Potato Chips can. In the can, Jeffers had placed plastic utensils, chewing gum, napkins, and a small amber pill bottle containing allergy medication.

Jeffers and his friends arrived at the track's Central Avenue gate around 7:30 A.M. They waited 30–45 minutes before the line began moving and another 30–45 minutes before they reached the admission windows. Posted at that gate were four signs warning of the search procedure, and the taped announcement had been checked earlier by Churchill Downs' head of security and found to be clearly audible. Jeffers testified at trial, however, that during this time he neither saw the signs nor heard the taped announcement. The only sign Jeffers remembered ever seeing at Churchill Downs was one which stated that alcoholic beverages were prohibited. Nonetheless, Jeffers knew from past experience that his parcels would be searched by the police before he would be allowed to enter.

After paying admission, Jeffers and his friends proceeded to the search area. Officer Deborah Heavrin searched the cooler and grocery bag. Jeffers was not patted down as part of the search. Upon finding the Pringles' potato chip can inside the bag, Officer Heavrin believed the can to be too heavy to contain potato chips, and opened the lid to see if it contained any forbidden items. Emptying the can, Officer Heavrin found the small amber plastic pill bottle at the bottom of the can. There was no label

affixed to the outside of the bottle, but an unattached prescription label was visible inside the bottle along with several pills.

When Heavrin inquired about the pill bottle, Jeffers replied that it contained his allergy medication. Officer Heavrin "thought he was probably lying," because it was a "common answer" to inquiry by police about pills. Being unexperienced in the identification of drugs, she asked Sergeant Robert Jones to have a narcotics officer examine the pills. Sgt. Jones testified at trial that he did not remember the incident involving Jeffers, but was identified by Heavrin as the colleague to whom she gave the pills. However, the trial took place three years after the incident, and Sgt. Jones did not even know about the lawsuit until shortly before trial. Given that set of facts, and the non-stop flow of people entering the track on that day, it is an altogether credible explanation that Sgt. Jones simply forgot about the incident.

Officer Heavrin testified that Sgt. Jones left with the pill bottle and returned in about a minute, saying "He thinks they're valium. You can either charge him or throw them away." (At trial, each of the narcotics officers who were at the track testified that he did not remember being asked to identify any pills as valium, and would not have identified Jeffers' pills as valium.) Jeffers asked Heavrin to call his doctor or allow him to do so, but Heavrin did not answer. Heavrin chose to arrest Jeffers and took him to a temporary holding facility located at the track at 8:44 a.m.

Heavrin filled out an arrest slip, listing "Drugs in improper container" as the charge against Jeffers. She turned the pill bottle over to a narcotics officer to have them sent for a laboratory analysis. After completing the forms, Heavrin returned to her duty at the gate. Jeffers testified that at all times Officer Heavrin was polite and professional.

Jeffers was held in a small cell with other arrestees at the holding facility for some time. While he was there, a police officer chose not to arrest a woman who had been brought in with four different pills, including valium, in one bottle. Jeffers asked the officer to examine his pills but the officer refused. Jeffers was eventually transported downtown to the jail facility at the Hall of Justice. There he underwent standard processing which included fingerprinting and a strip-search. Jeffers testified that whenever he said anything to a police or corrections officer, he was warned that if he didn't "shut up," he would spend the entire weekend in jail. It was not until about 10:00 p.m. that Jeffers appeared before a judge and paid his bail. Jeffers then was forced to wait until after midnight to get his property back, because officials inside the property room did not open the door, despite the presence of Jeffers and others who sought return of their property.

Jeffers was scheduled to appear for trial on June 1, 1983 in Louisville. Heavrin received her subpoena on or about May 13, and consulted her copy of the initial arrest slip (which contained Jeffers' home address). In accordance with procedure she contacted the narcotics or laboratory department to see if the lab report on the confiscated pills was completed. When Heavrin called, the lab report was not in, but, it was completed by May 23, and showed that the pills were indeed allergy medication. Heavrin did not contact the lab a second time prior to the trial date to see if the report had arrived. She waited until the morning of the trial before calling the court clerk to say that she would not be there because the lab report was not ready. Jeffers had already travelled the four hours to Louisville from Fort Wayne, only to find that his case would be continued until June 22.

Heavrin received her second subpoena about a week before the new trial date, and by that time knew that the lab report was complete and showed no evidence of any illegal substance. Again, even after consulting her arrest slip, she did not contact anyone—not the prosecutor, the defense attorney, Jeffers, nor even the court clerk —about the lack of any criminal evidence against him. On June 22, Heavrin had a doctor's appointment and did not appear in court. She attempted to call the clerk that

morning and left a message only that she would not be there. Heavrin expected the case to be either dismissed or continued until a third date. Again, Jeffers had driven down from Fort Wayne only to find the prosecution unprepared. This time, the charges were dismissed.

### Conclusions of Law

The defendants first contend that Jeffers had no reasonable expectation of privacy in his parcels, and thus has no grounds for protesting the search. The Fourth Amendment protects people against only unreasonable intrusions on their reasonable expectations of privacy. The standard for determining a legitimate or reasonable expectation of privacy is whether (1) the person subjectively exhibits an expectation of privacy, and (2) society recognizes that expectation as reasonable. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967) (Harlan, concurring).

■ Jeffers expectation of privacy is first challenged on the grounds that he neither did have nor could have had any reasonable expectation that his parcels would not be searched prior to entering the track. The mere knowledge that one may be subject to search does not automatically render a person without any reasonable expectation of privacy. *Chenkin v. Bellevue,* 479 F.Supp. 207 (S.D.N.Y.1979). This applies to private as well as public entities. Passengers on private airlines, for example, retain an expectation of privacy in their hand luggage even with the knowledge that they will be subject to a search as a pre-condition to boarding. *United States v. Davis,* 482 F.2d 893 (9th Cir.1973). Thus Churchill Downs' status as a private corporation should not permit it to nullify an individual's legitimate expectations of privacy.

The reliance of Heavrin and the JCPD upon *United States v. Mankani,* 738 F.2d 538 (2nd Cir.1984), is misplaced. That case concerned an incident in which officers were able to hear incriminating statements made by a defendant in an adjoining hotel room by listening through a pre-existing hole in the wall. The court admitted the evidence on the grounds that the hole prevented the defendant from having any legitimate expectation that his conversation might not be overheard by someone in the other room. The basis for the court's ruling—essentially plain view—clearly does not apply to the present situation of a closed Pringles can at the bottom of a grocery sack.

■ Churchill Downs separately contends that Jeffers had no reasonable expectation of privacy because the contents were "destined for public display in the infield." Whether or not an object is "destined for public display" is irrelevant to determining the existence of an expectation of privacy when the object is not currently in public view. As long as the object is concealed from public view in a place in which the person has a legitimate expectation of privacy, the Fourth Amendment applies. To hold otherwise, as Jeffers' counsel aptly remarks, would be to allow the police to search closets on the grounds that the clothes within are "destined for public display."

■ Churchill Downs' contention that Jeffers lost any expectation of privacy by giving the bag to his friend to carry is equally without merit. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed. 2d 633 (1980), upon which Churchill Downs relies, held only that the defendant did not have a legitimate expectation of privacy in the purse of a woman whom he had just recently met. In the present case, Jeffers and his friends were merely carrying the bag and other items into the track. Gaining assistance to carry items over a short distance does not destroy an expectation of privacy. Were the opposite true, policemen could station themselves at hotels and airports and search any piece of luggage which a guest or passenger allowed a porter to carry.

Since Jeffers had a legitimate expectation of privacy in the contents of his grocery bag, that expectation is protected by the Fourth Amendment from unreasonable searches and seizures. A warrantless search is per se unreasonable, unless it

falls under one of several carefully proscribed exceptions. *Katz*, 389 U.S. at 357, 88 S.Ct. at 514. The burden in a civil action such as the case at bar falls upon the defendants to justify the warrantless procedure. *Wheaton v. Hagan*, 435 F.Supp. 1134 (M.D.N.C.1977) (relying on *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)).

▮▮▮ Defendants argue first that the search was a valid consent search. It is clear from the evidence that Jeffers did not verbally consent to the search, nor did Officer Heavrin ask if she could search his parcels. Under certain circumstances, though, an individual may manifest a consent to search by his actions. *United States v. Davis, supra,* (agreeing that an airport search could be upheld on consent grounds). The *Davis* court stated:

> "We have held that, as a matter of constitutional law, a prospective passenger has a choice: he may submit to a search of his person and immediate possessions as a condition to boarding; or he may turn around and leave. If he chooses to proceed, that choice, whether viewed as a relinquishment of an option to leave or an election to submit to the search, is essentially a 'consent,' granting the government a license to do what it would otherwise be barred from doing by the Fourth Amendment." *Id.* at 913.

This holding has been adopted by the Sixth Circuit in *United States v. Dalpiaz*, 494 F.2d 374 (6th Cir.1974).

Several federal district courts have addressed gate searches conducted at rock concerts, and have found them unconstitutional. *Gaioni v. Folmar*, 460 F.Supp. 10 (M.D.Ala.1978); *Stroeber v. Commission Veteran's Auditorium*, 453 F.Supp. 926 (S.D.Iowa 1977); *Wheaton v. Hagan*, 435 F.Supp. 1134 (M.D.N.C.1977); *Collier v. Miller*, 414 F.Supp. 1357 (S.D.Tex.1976). However, notwithstanding plaintiff's urgings, these cases are not dispositive of the constitutionality of the searches at Churchill Downs.

Tony Jeffers knew from past experience that he would be searched if he sought admission to Churchill Downs. With this knowledge, Jeffers chose to attend the Derby and, consequently, to submit to the search. If he wanted, he could have chosen to avoid the search by not bringing any parcels or by not attending. In *Dalpiaz, supra,* the Sixth Circuit recognized that, as long as a person in such a situation has the right to turn around and leave without being searched, if that person then makes the decision to enter with the knowledge that he will be searched, he has consented to the search. 494 F.2d at 376.

Jeffers argues that warning signs do not render a subsequent search valid on consent grounds, relying on *Ringe v. Romero*, 624 F.Supp. 417 (W.D.La.1985). The *Ringe* opinion, however, focuses on the presence of signs as the sole basis for consent, citing to *Gaioni v. Folmar, supra.* (*Cf. Collier*, 414 F.Supp. at 1366, n. 10 (". . . the presence of conspicuous signs at the entrances [to the arena] might well justify a carefully limited search of persons who persist in carrying large containers into [the arena].").) In the present case, Jeffers had knowledge independent of the signs and announcements that his parcels would be searched. From this evidence, this Court concludes that by his choice to attend the Derby, Jeffers consciously and affirmatively consented to the search of his parcels at the gate.

▮▮▮ In order to be valid, a consent to search must be obtained voluntarily and not through coercion. This is a determination to be made in consideration of the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Several relevant factors to be considered are the number of officers present, *United States v. Hearn*, 496 F.2d 236 (6th Cir.1974); the environment in which the search took place, *Bustamonte, supra;* the subjective state of mind of the individual, *id.,* whether the individual was forewarned that a search would take place as a condition to entry, *Stroeber, supra, Collier, supra;* and whether the individual knew of his right to refuse consent. *Bustamonte, supra.*

Jeffers made the decision to attend the Kentucky Derby of his own free will. No

one from either Churchill Downs or the JCPD forced or coerced him in this choice. When he arrived at the track and was searched, he was not in the midst of a threatening or coercive environment. Accompanied by three close friends, Jeffers proceeded to a designated area where his parcels were searched by two officers whom he agreed were polite and professional. Other officers were present at nearby turnstiles, but they were occupied with their own searches. The search occurred outdoors in daylight, in front of countless other members of the public. Moreover, as indicated above, Jeffers was forewarned by his own experience that his parcels would be searched if he sought entry to the track. He also knew that he had a right to refuse to submit to the search by not entering the track.

Two of the federal courts in the rock concert cases held that consent to search given in the belief that one will be denied access to the auditorium was "an inherent product of coercion." *Gaioni v. Folmar,* 460 F.Supp. at 14; also *Collier v. Miller,* 414 F.Supp. at 1366. In each instance, the court relied on the holding in *United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 282 U.S. 311, 328–29, 51 S.Ct. 159, 164, 75 L.Ed. 359 (1931), in which the Supreme Court stated, "The rule is that the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." *Id.* at 328–29, 51 S.Ct. at 164.

However, there is no legal right or privilege to attend Churchill Downs, a private facility, that is granted by the state. In *James v. Churchill Downs,* 620 S.W.2d 323 (Ky.App.1981), the Kentucky Court of Appeals upheld the right of Churchill Downs to exclude whomever it desired from the track, so long as the exclusion was not based upon race, creed, color, or national origin. *Id.* at 324 (citing *Rodic v. Thistledown Racing Club, Inc.,* 615 F.2d 736 (6th Cir.1980). By comparison, the auditoriums involved in the rock concert cases were publicly owned, financed, and managed.

Furthermore, even the *Stroeber* court acknowledged that "there is nothing constitutionally offensive" in banning certain items from an auditorium. 453 F.Supp. at 933. Requiring consent to search as a condition to admission to Churchill Downs, therefore, is not inherently coercive.

Thus, based on the evidence at trial and the current case law, this Court concludes that Jeffers voluntarily consented to the search of his bag as a condition to his entry to Churchill Downs.

■ Even if this Court had not found that Jeffers consented, the search could be upheld as a lawful administrative search conducted in compliance with *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). A lawful administrative search must be conducted in furtherance of a legitimate government purpose or public necessity other than a search for criminal evidence. *Id.*

The Court in *Camara* held that a warrant was necessary for a building inspection, because the inspection was conducted at the discretion of the officer, and without a warrant an occupant had no way of verifying the inspector's authority to enter and search. *Id.* Warrants have traditionally not been required for administrative searches whose procedures satisfy these concerns. See, *e.g., United States v. Dalpiaz,* 494 F.2d 374 (6th Cir.1974) (airport search); *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir.1972) (courthouse search); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (immigration checkpoint on highway). In *Dalpiaz,* the Sixth Circuit noted a warrant was not required for an airport search since the search procedure was indiscriminately and uniformly applied without relying on the individual officer's discretion. 494 F.2d at 376.

■ An administrative search must not only be justified by some public necessity but also must be reasonably likely to be effective in averting the potential danger. These factors of necessity and efficacy must be balanced against the degree and the nature of the intrusion of individual

privacy that the search entails. *United States v. Skipwith,* 482 F.2d 1272 (5th Cir. 1973).

Prior to the institution of the new search policy in 1981, there were a large number of cuts severe enough to require sutures which were caused by broken glass. In addition, there were a large number of fights, and bottles and other dangerous objects were often thrown through the crowd. The JCPD and Churchill Downs believed that drunkenness was a major contributing factor to the problem. The evidence clearly shows that a danger to the public existed which necessitated safety measures designed to keep out alcohol and potentially dangerous objects. This lies in stark contrast to *Collier,* where the court stated, "Obviously a proven history of disturbances, a factor completely absent in the instant case, would do much to underscore the need for an adequate search procedure." 414 F.Supp. at 1366, n. 10. (Emphasis added). See also: *Gaioni,* 460 F.Supp. at 13–14.

The search policy appears to have been markedly successful in achieving its goal of reducing the number of injuries at the Derby. The sharp reduction in injuries is synonymous with the institution of the new policy in 1981. There is no evidence of any factor other than the search policy which might account for this dramatic about face.

Three elements of necessity and efficacy of the search are to be weighed against the intrusiveness of the search. Plaintiff relies upon *Collier* for the proposition that the threat from fights and thrown objects "pales in comparison to the dangers" addressed by courthouse and airport searches. 414 F.Supp. at 1362. See also: *Wheaton,* 435 F.Supp. at 1145.

The search procedure at Churchill Downs consisted of a brief inspection of the contents of all parcels. There was arguably a greater intrusion because the officers primarily used their hands to conduct the searches, as opposed to an x-ray machine and magnetometer as used at airports and courthouses. Any personal feeling of intrusion caused by the search is significantly lessened because everyone with a parcel was searched and thus no true stigma resulted therefrom.

The searches in the above-referenced rock concert cases were not conducted in a uniform manner. Instead, police officers merely grabbed or stopped patrons at random and searched them. Many people carrying parcels or wearing unusually baggy or layered clothing were not searched. Moreover, in each instance the search was conducted as a condition of entry to the auditorium only for rock concerts but not for other events. The courts rightfully found fault in such arbitrary and unjustified searches.

There was no such disparate treatment in the search procedure at Churchill Downs. Since every person who carried in a parcel was required to submit that parcel to inspection, there was indeed uniformity. This universal search procedure has been applied not only to all patrons entering from all gates but also on every day the track is open. There was no sudden grabbing of patrons by the police—in fact, even if patrons did not see the signs nor hear the tape, they could both see and hear the searches going on as they reached the head of the line. Finally, the searches were conducted without any significant delay.

This Court finds, therefore, that on balance, the searches at Churchill Downs are not an unduly intrusive invasion of privacy.

Jeffers finally challenges the legality of the search on the grounds that the search was in actuality a search for drugs. Jeffers argues that no reasonably prudent office would have opened the Pringles can unless he or she was searching for drugs. This contention can be quickly dismissed. As Officer Heavrin testified at trial, the can could easily have contained weapons, alcohol, or glass objects—definitely a reasonable belief, especially in light of the extreme measure which some people take in order to sneak alcohol into Churchill Downs. Opening the Pringles' can can best be categorized as good, professional police work within the permissible scope of the search.

Contrary to the position taken by Jeffers, when Officer Heavrin gave the pill

bottle to Sgt. Jones in order to have it examined by an experienced narcotics officer, there was no seizure of constitutional significance. Sgt. Jones returned very quickly, according to Jeffers himself, "in no more than a minute." Officer Heavrin was merely seeking the informed opinion of any other officer who was for all practical purposes on the scene. No significant or necessary distinction exists between her giving the pill bottle to another officer to have it visually examined immediately, and requiring the narcotics officer to come over and examine it as it sat on top of the cooler.

■ Jeffers argues that even if the search was lawful, his arrest was not based upon probable cause. Probable cause for arrest exists where under the facts and circumstances known to the officer from "reasonably trustworthy information," a reasonably prudent officer would be warranted in the belief that a crime has been or is being committed. *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 2d 327 (1959).

Officer Heavrin had been told by a superior officer that the pills had been identified as valium, presumably by a narcotics officer. There was no reason for her to doubt that the information was "reasonably trustworthy." The pill bottle itself was suspicious, with only an unattached label inside the bottle rather than the customary exterior prescription label affixed with adhesive. Furthermore, Officer Heavrin's initial disbelief of Jeffers' answer that the pills were allergy medication was supported by what Sgt. Jones told her. Officer Heavrin had probable cause to arrest Tony Jeffers.

The decision of Officer Heavrin to arrest Jeffers was made at her own discretion, like any other arrest. Police officers daily use their individual discretion in making arrests, so it is not surprising to learn that some people were arrested for similar offenses on that day while others were not. This in no way affects the legitimacy of a lawful arrest made on probable cause.

Jeffers also claims his arrest was illegal because there is no Kentucky statute under which he could be arrested for having valium in his pill bottle. This contention is simply without merit. There are several statutes under which Jeffers could have been prosecuted. See KRS 217.175(1, 2, 4, 10); 218A.140(2, 4). (Removal of prescription labeling; possession of controlled substance without proper label.)

■ Having upheld the search and arrest, this Court nevertheless feels compelled to address the treatment Jeffers received during his incarceration and prosecution. If this case is indicative of standard treatment which people receive after being arrested in Jefferson County, that standard cries out for change.

During the more than fourteen hours that Jeffers was in custody, the evidence is uncontradicted that he was confronted with several unduly rude police and corrections officers. Each time Jeffers asked a question, he was told to "shut up," and was threatened with being kept in jail for the weekend if he did not keep quiet. Undoubtedly, these officers were in the midst of a very hectic day and were confronted with instances of drunk and rowdy arrestees. However, it is of vital importance that law enforcement officers do not lose sight of the fact that they were dealing with individuals who are not all alike and some may have a legitimate question or grievance to air.

The prosecution of Tony Jeffers was itself poorly and negligently pursued. Officer Heavrin was subpoenaed well in advance of each trial date. Before the first trial date, Officer Heavrin called once to see if the lab report on the pills had been returned. Although the report was not in when she called, it had been returned by May 23—nine days before trial—and showed that the pills were only allergy pills. Heavrin neither checked on the report a second time nor called the prosecutor or court clerk in advance to inform them that the lab report had not been completed. As a direct result, Jeffers was required to drive four hours from his home to Louisville for no good reason. Even if Heavrin could be excused from not checking on the lab report's progress a second

time, there can be no excuse for failing to contact someone associated with the prosecution before the trial date.

Moreover, she did know at least a week before the June 22 trial date that there was no criminal evidence against Jeffers. Once again, she did not contact anyone upon learning this information. Jeffers, for a second time, needlessly had to make the long drive down to Louisville.

Even if Tony Jeffers had lived in Louisville, Officer Heavrin's conduct would leave much to be desired. He would still have been living under the ominous shadow of an upcoming trial, and would have been forced to miss work. The fact that Tony Jeffers lived four hours from Louisville only worsened the inevitable consequences of Officer Heavrin's actions (or inactions). Our society expects that its law enforcement officers should not cause innocent people to be prosecuted unnecessarily. Arrest and prosecution for a criminal offense can carry a heavy stigma. When an officer discovers or should have discovered evidence that exonerates an individual who has been arrested, that officer has an affirmative duty to make the necessary contacts so that the prosecution will cease immediately. However many arrests or cases an officer is involved in, this duty cannot and must not be forsaken, for each of those arrest slips represent a person—a person who deserves to be free from prosecution if there is no incriminating evidence against him.

Thus, although Jeffers' complaint sufficiently makes a separate claim for damages as the result of negligent prosecution, damages were not established during trial with the specificity required in order for this Court to render an award. For that reason and that reason only, an award of damages will not be made to the plaintiff for his claim of negligent prosecution.

An Order reflecting this Court's ruling is entered simultaneously herewith.

### ORDER

The Court having entered simultaneously herewith its Findings of Fact and Conclusions of Law and being otherwise sufficiently advised;

IT IS HEREBY ORDERED that judgment be and hereby is granted in favor of the defendants.

This is a final and appealable Order there being no just cause for delay.