Tony **JEFFERS**, Plaintiff–Appellant,
Cross–Appellee,

v.

Debbie **HEAVRIN**; **Jefferson County, Kentucky**, Defendants–Appellees,
Cross–Appellants,

**Churchill Downs, Inc.**,
Defendant–Appellee,

**City of Louisville**, Defendant.

Nos. 89–5994, 89–6059.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 22, 1991.

Decided May 13, 1991.

Rehearing and Rehearing En Banc Denied
July 3, 1991.

Christopher P. Rivers, Nutt & Mayer, Louisville, Ky., Albert T. Quick, Dean, Ohio Northern University, Claude W. Pettit College of Law, Ada, Ohio, David A. Friedman (argued), American Civil Liberties Union of Kentucky, Louisville, Ky., for Tony Jeffers.

William T. Warner (argued), Conliffe, Sandmann, Gorman & Sullivan, N. Scott Lilly, Asst. Co. Atty., Louisville, Ky., for Debbie Heavrin and Jefferson County.

William H. Hollander (argued), and M. Stephen Pitt, Wyatt, Tarrant & Combs, James C. Hickey, MacKenzie & Peden, Louisville, Ky., for Churchill Downs, Inc.

Before GUY and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

RALPH B. GUY, JR., Circuit Judge.

Plaintiff, Tony Jeffers, appeals from a judgment entered after a bench trial in favor of defendants in this 42 U.S.C. § 1983 action. Jeffers claimed damages stemming from an alleged illegal search and seizure and a subsequent arrest and prosecution.

Defendants Heavrin and Jefferson County cross-appeal, although no relief was granted against them. The basis of the cross-appeal is that the court's opinion contains language gratuitously criticizing the performance of Officer Heavrin and county corrections officers. The district judge also concluded that "although Jeffers' complaint sufficiently makes a separate claim for damages as a result of negligent prosecution, damages were not established during trial with the specificity required in order for this Court to render an award." *Jeffers v. Heavrin*, 701 F.Supp. 1316, 1326 (W.D.Ky.1988).

Upon a full review of the record, we conclude that there was a lack of probable cause for arrest and we reverse and remand.

## I.

On May 7, 1983, Jeffers, in the company of three friends, arrived at Churchill Downs in Louisville, Kentucky, for the purpose of attending the 1983 running of the Kentucky Derby. This annual event attracts a crowd of approximately 130,000 persons. Since the crowd exceeds the seating capacity of the race track, for this one event only patrons are admitted to the infield of the track in numbers up to 75,000. There is no fixed seating in the infield.

Jeffers, who had attended several previous Derbys, intended to sit in the infield and so arrived at the track very early to ensure a favorable location. Since it was to be a long day, Jeffers's group was equipped with a cooler, blankets, sleeping bags, and groceries. Jeffers was aware of the track policy of not allowing certain items to be brought into the premises. Large signs were conspicuously posted, which read:

"NOTICE GRILLS, CHARCOAL, BOTTLES, WEAPONS AND ANY ITEM WHICH MAY BE USED AS A WEAPON OR A MISSILE, WHICH COULD BE USED TO INJURE THE GENERAL PUBLIC ARE EXPRESSLY FORBIDDEN IN AND ON CHURCHILL DOWNS PROPERTY. PATRONS MUST TAKE THEIR PARCELS BACK

TO THEIR VEHICLES, DEPOSIT SUCH ITEMS IN A DUMPSTER OR SUBJECT ITEMS TO INSPECTION BY POLICE."

*Jeffers*, 701 F.Supp. at 1318–19. Loudspeakers regularly issued the same warning. This policy had existed at Churchill Downs since the mid-sixties and was prompted by drunken and unruly crowds in the infield that led to a number of personal injuries. Although the Jefferson County Police Department (JCPD) patrolled the infield, the persons charged with enforcing the track policy were private security guards hired by Churchill Downs.

Despite these efforts at crowd control, the problems being generated by the infield crowd continued and, in 1981, JCPD requested permission from Churchill Downs to take over the infield gate inspection responsibility. The track agreed, and in each subsequent year this procedure continued.

When Jeffers and his friends arrived at the gate, they knowingly and willingly subjected themselves to a search of the coolers and grocery bag. No personal or pat-down searches were conducted. Defendant Heavrin happened to be the JCPD officer at the gate, and it is not disputed that she was courteous and professional. In the course of looking into the grocery bag, defendant Heavrin came across an obviously opened canister of Pringles potato chips. When Heavrin picked up the can, it was apparent that it was too heavy to contain potato chips. Upon opening the container, she found plastic eating utensils, chewing gum, napkins, and a small amber bottle containing pills. There was no label on the outside of the bottle, but inside was an unattached prescription label and several pills. What happened next is accurately described in the district court opinion:

> When Heavrin inquired about the pill bottle, Jeffers replied that it contained his allergy medication. Officer Heavrin "thought he was probably lying," because it was a "common answer" to inquiry by police about pills. Being unexperienced in the identification of drugs, she asked Sergeant Robert Jones to have a narcotics officer examine the pills.

Sgt. Jones testified at trial that he did not remember the incident involving Jeffers, but was identified by Heavrin as the colleague to whom she gave the pills....

> Officer Heavrin testified that Sgt. Jones left with the pill bottle and returned in about a minute, saying "He thinks they're valium. You can either charge him or throw them away." (At trial, each of the narcotics officers who were at the track testified that he did not remember being asked to identify any pills as valium, and would not have identified Jeffers' pills as valium.) Jeffers asked Heavrin to call his doctor or allow him to do so, but Heavrin did not answer. Heavrin chose to arrest Jeffers and took him to a temporary holding facility located at the track at 8:44 a.m.

> Heavrin filled out an arrest slip, listing "Drugs in improper container" as the charge against Jeffers. She turned the pill bottle over to a narcotics officer to have them sent for a laboratory analysis. After completing the forms, Heavrin returned to her duty at the gate....

*Jeffers v. Heavrin*, 701 F.Supp. at 1320.

It was midnight before Jeffers was processed and released on bail, and his trial was set for June 1, 1983, in Louisville. During the time he was being processed, he received rude and inconsiderate treatment but was not physically abused in any way.

In preparation for trial, Officer Heavrin sought the results of the lab analysis on May 13, 1983, but the tests had not been completed. The results were completed on May 23, 1983, but Heavrin made no further inquiry and simply called the court on June 1 to say she would not be there because the lab report was not ready. Had she read the report, she would have learned that it confirmed the pills were allergy medication, just as Jeffers had indicated. Since Jeffers was never told the case was to be adjourned, he needlessly travelled from his home in Ft. Wayne, Indiana, to Louisville for the trial. A new trial date was set for June 22, 1983.

In the interim, Heavrin learned of the negative lab report, but she took no action and discussed it with no one. On June 22, she did not appear in court because of a doctor's appointment. Jeffers, again having driven from Ft. Wayne, was present, and when the prosecutor was unable to go forward with the case, it was dismissed. This lawsuit followed.

## II.

■ We conclude, as did the district judge, that the gate search was consensual. Because we reverse on other grounds, we find it unnecessary to discuss at length the consent issue. We do note in passing, however, that difficult legal issues are involved. If Churchill Downs had enacted a policy of restricted entry and enforced it itself, problems of a constitutional dimension would not be implicated. When a police department is given the right to be the enforcer, however, it raises questions as to the limits of the authority to conduct general searches without any particularized showing of probable cause or even reasonable suspicion. There is no doubt that an important public purpose was served. If the amount of alcohol, weapons, and potential missiles brought into the infield could be controlled, fewer problems and injuries would result. The history of the enforcement and success of this rule proves that to be the case. However, it might be equally efficacious to set up a road block and search all cars headed for the race track. Notwithstanding the recent ruling in *Michigan Department of State Police v. Sitz*, — U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), it is doubtful that anyone would seriously contend that such action would pass constitutional muster.[1] Thus, in concluding that the search was consensual, we decide no more than that Jeffers knowingly, willingly, and voluntarily submitted to the search. We leave for another day the issue of whether the police can use the entry policy of a private entity to generate "consent" and thus justify a search that otherwise would be beyond the power of the police agency to conduct. The dangers inherent in this scenario serve as the backdrop for our discussion of the probable cause issue.

## III.

If the gate searches had continued to be totally private and conducted by private security guards, what occurred in this case could not have happened. The security guards, based on what they discovered, would simply grant or deny entry. There would be no further ramifications. However, if a police officer conducts this search and finds no prohibited articles, but in the course of the search discovers, for example, an unregistered firearm, the matter does not rest there. Notwithstanding the specific function that Officer Heavrin was temporarily performing at the gate, she was nevertheless at all times a police officer and bound to enforce and not overlook violations of the law even if totally unrelated to her gate searches. Stated another way, the possible ramifications of Jeffers's "consent" are considerably different if a police officer, as opposed to a private security guard, conducts the search—as Jeffers found out to his detriment.

■ Although voluntary consent is the substitute for probable cause as to the initial search, when it comes to the arrest, the officer must have independent probable cause. We simply cannot find probable cause in the "totality of the circumstances" presented here.[2] The pill bottle contained no substance that Officer Heavrin recognized as a controlled substance. Jeffers offered a believable explanation for what was in the bottle and even offered to call, or have the officer call, his doctor. There was nothing suspicious about the circumstances. Jeffers and his friends were obvi-

---

1. In the case of drunk-driver road blocks, the driver, if intoxicated, is committing an offense in the presence of the police authority. In the case at bar, it was not an offense to have bottled beer in a cooler. The officers were conducting a search for "contraband" that was not illegal but merely prohibited as a result of the entry policy of a *private* entity.

2. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

ously headed for the infield to stake out a good viewing site for the Derby. They met no "profiles," nor were there any other indications in their appearance or decorum to suggest illegal drug involvement. In context, there was nothing any more suspicious about the pill bottle in the Pringles can than there was about the plastic utensils and chewing gum being there. It was obvious that the purpose of the can was to segregate small articles in one container before putting them in the larger grocery bag.

To the degree that the pills were themselves identifiable, it was by the markings "DAN" on one side and "5058" on the other. The Physicians' Desk Reference, which incidentally was available to Officer Heavrin, lists the generic allergy medication PBZ as containing these identifying symbols.

We cannot attach much significance to Officer Heavrin's attempt to have another officer identify the pills. We never learned who that officer might have been, and the four narcotics officers who were on the premises not only deny making any identification of the pills as valium but also indicate it would have been clear to them that the pills were not valium. Under these circumstances, we are forced to conclude that the requisite probable cause for an arrest was lacking. In reaching this conclusion, we do not foreclose an argument upon remand that Officer Heavrin, although in the wrong, may nonetheless be entitled to qualified immunity. We pass no judgment on the merits of such an argument, if made.

### IV.

 We also conclude the court erred in determining that damages were not proved with sufficient specificity to be awarded. Although damages of the type incurred here do not generate paid receipts or documented out-of-pocket expenses or losses, they are not speculative and appear, to us at least, relatively easy to compute.

Due to our ruling on the probable cause issue, we pass no judgment on the viability of a "negligent prosecution" theory.[3] It may well be that this theory will now be subsumed by the probable cause determination, since it would appear the damages would be the same under either theory.

### V.

Jeffers has conceded on appeal that if we uphold the "consent" search and decide the case on the arrest issue that Churchill Downs is no longer implicated. We believe that to be the correct result and the track should be dismissed from any further proceedings in this matter.

We also conclude that Officer Heavrin's arrest decision was a random act and not done pursuant to a county policy, so Jefferson County should also be dismissed from this case.

### VI.

Inasmuch as this was a bench trial, we REVERSE and REMAND for further proceedings consistent with this opinion.

BOGGS, Circuit Judge, concurring in part and dissenting in part.

I disagree with Judge Guy's opinion in only one respect. The opinion holds that, as a matter of law, Officer Heavrin did not have probable cause to make the arrest. However, the opinion indicates that the officer did no wrong in searching the containers Jeffers was carrying into the Churchill Downs infield, in finding the small pill bottle, or in opening the bottle and examining the contents.

Given that Heavrin's conduct was permissible to that point, when she arrested Jeffers, she knew the following facts.

(1) Some type of pill was being carried in a bottle with no label attached to the outside, and an otherwise unidentified label, but not for valium, was lying loose on the inside of the bottle. *J.A.* at 325. (How-

---

3. If such a theory exists, it would have to be a pendent state claim, since negligent conduct

will not support a section 1983 action.

ever, we might infer that the label indicated the pills were allergy medication, since that is what they turned out to be).

(2) Kentucky has a state law forbidding the possession of controlled drugs in a container other than the original prescription container. KY.REV.STAT. § 218A.210. Other statutes forbid mislabeling any drug. *Id.* §§ 217.175(2) & 217.065(1).

(3) According to her story, Heavrin asked a fellow officer to have the pills identified, and that officer reported back to her that the pills were valium. *J.A.* at 117–118; 123; 314.

On these facts, Heavrin had probable cause to believe that, indeed, prescription drugs were being carried in an improper container. The record of her examination by counsel for the plaintiff makes it quite clear that this was the reason she arrested Jeffers. In pertinent part, the transcript reads as follows:

Q. At the time that you arrested Mr. Jeffers, did you feel as though you had probable cause to make an arrest?

A. Yes, sir, I did.

Q. Will you tell us what facts you based that opinion on at that time?

A. The fact that the pills were identified by one of our narcotics detectives as being Valium.

*J.A.* at 314.

Q. Okay. Will you tell the Court any facts that you have which cause you to believe that even if this was Valium[,] Mr. Jeffers was committing a criminal offense, do you have any facts?

A. The label in the container identified it as something else.

*Id.* at 325.

Under the circumstances of Derby morning, Officer Heavrin can hardly be faulted for not having left the post to which she had been assigned to attempt to consult personally the Physician's Desk Reference that the court indicates was available.

The difficulty with the argument I have just made is that the district court's opinion

does not agree with Heavrin's story. According to the district court, as correctly quoted in our court's opinion, Sgt. Jones, to whom she had given the bottle for identification,[1] returned and said:

He thinks they're valium. You can either charge him or throw them away.

*Jeffers v. Heavrin,* 701 F.Supp. 1316, 1320 (W.D.Ky.1988).

Our court is not impressed with the efficacy of this remark as providing probable cause. I agree that it is a bit thin. However, that is *not* the remark that appears in the record. Instead, the only rendition of this event that is in the record is Heavrin's unequivocal statement.

He told me that the pills were valium and I could charge Mr. Jeffers if I wanted to.

*J.A.* at 123.

On this view of the facts, the general rule that an officer may rely on facts known to other officers and relayed to the arresting officer comes into play. *United States v. Ventresca,* 380 U.S. 102, 110–11, 85 S.Ct. 741, 746–47, 13 L.Ed.2d 684 (1965); W. LAFAVE, 2 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.5 (2d ed. 1987). This rule holds even if the facts as related turn out to be erroneous in good faith. *See United States v. Cummins,* 912 F.2d 98, 102–03 (6th Cir.1990).

To the extent the district court found as a fact that Sgt. Jones made the statement quoted in the district court's opinion, the court is clearly in error. It simply is not in the record.

If the district court disbelieves Heavrin's testimony as to what she was told, then I have no problem with a finding of no probable cause. However, the district court has not done so. On the state of this record, Officer Heavrin should not be faced with a flat holding that no probable cause could have existed. *See Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987) (plaintiff required to show that rights were so clearly established that any reasonable officer would have clearly understood conduct vio-

---

1. This is according to Heavrin. Jones does not remember the specific incident, although he did, on several occasions that morning, take items to

narcotics officers for identification and report the result to an investigating officer. *J.A.* at 84.

lated those rights). I appreciate the court's distinction (p. —) that Heavrin may still have a qualified immunity defense if some reasonable officer could have thought that probable cause exists on these facts. This may be cold comfort, however, in light of our court's holding on the law, and our acceptance of the district court's clearly erroneous rendition of the testimony. I would, therefore, remand for further fact-finding on this issue, and I respectfully dissent from that portion of the court's opinion that instead decides that there was no probable cause as a matter of law.

EDWARDS, Senior Circuit Judge, concurring in part and dissenting in part.

I agree that there was no probable cause for the arrest. Nonetheless, I part from the majority on one issue. The opinion upholds the warrantless search of a Kentucky Derby patron's allergy pill bottle as legal. This, I cannot do, and therefore, dissent.

First, I recognize, of course, that crowd control is a major problem at the Kentucky Derby. I agree that the warrantless police searches were conducted with an important purpose in mind, to protect the patrons of the Derby. However, I question whether the searches were more intrusive than reasonably necessary to accomplish the underlying purpose of preventing violence. The police searched not only for bottles, weapons, and missiles, but also for items which posed no risk, such as the allergy pills in Mr. Jeffers' prescription vial. Thus, in my view, the scope of the searches was unreasonable because it was not logically linked to any perceived or real danger. That is, the police went too far. *U.S. v. $124,570 U.S. Currency,* 873 F.2d 1240, 1243–47 (9th Cir.1989); *See Terry v. Ohio,* 392 U.S. 1, 15, 17–19, 88 S.Ct. 1868, 1877–1879, 20 L.Ed.2d 889 (1967); *See generally* W. La-Fave, *4 Search and Seizure,* § 10.7(a) at 40–42 (2d ed. 1987).[1]

Second, even assuming arguendo that warrantless police searches of all Derby patrons are legal, Officer Heavrin's search of Mr. Jeffers' prescription bottle can still not be justified on this broad basis. The authority for the search policy was limited in scope to its express purpose, here, to detect alcohol, weapons, and missiles. These items could not plausibly rest inside a small pill vial (the contents of which were visible from the outside). Therefore, Officer Heavrin went beyond the scope of the search when she opened Mr. Jeffers' pill bottle, and to this extent, the search was illegal. Officer Heavrin went too far. *U.S. v. $124,570 U.S. Currency,* 873 F.2d 1240, 1244–48 (9th Cir.1989); *See Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

My third concern follows from the other two. When Mr. Jeffers entered Churchill Downs, he could not have plausibly consented to a future search that would go beyond its own express limits. Therefore, when the police did go too far, they should not be shielded by the "troublesome doctrine" of implied consent. W. La Fave, *4 Search and Seizure,* § 10.7(a) at 41–42 (2d ed. 1987); W. LaFave, *3 Search and Seizure,* § 8.2(1) at 220 (2d ed. 1987); *Serpas v. Schmidt,* 827 F.2d 23, 29 (7th Cir.1987); *U.S. v. $124,570 U.S. Currency,* 873 F.2d 1240, 1247–48 (9th Cir.1989).

Accordingly, I would reverse and remand consistent with this determination.

---

1. I may add that courts dealing with similarly intrusive searches at public events have also come to this conclusion. *See, e.g. Wheaton v. Hagan,* 435 F.Supp. 1134 (M.D.N.C.1977); *Collier v. Miller,* 414 F.Supp. 1357 (S.D.Tex.1976); *Stroeber v. Commission Veteran's Auditorium,* 453 F.Supp. 926 (S.D. Iowa 1977); *Jacobsen v. City of Seattle,* 98 Wash.2d 668, 658 P.2d 653 (1983); *State v. Carter,* 267 N.W.2d 385 (Iowa 1978); *Nakamoto v. Fasi,* 64 Haw. 17, 635 P.2d 946 (1981).